UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. 03-47-JMH

Eastern District of Kentucky
FILED

NOV 0 7 2003

AT FRANKFORT
LESLIE G WHITMER
CLERK U S DISTRICT COURT

KENTUCKY POWER COMPANY D/B/A
AMERICAN ELECTRIC POWER                          PLAINTIFF

v.

MARTIN J. HUELSMANN, *et al.*                     DEFENDANTS

- and -

LOUISVILLE GAS AND ELECTRIC COMPANY and
KENTUCKY UTILITIES COMPANY                       PLAINTIFFS

v.

MARTIN J. HUELSMANN, *et al.*                     DEFENDANTS

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

*May it please the Court:*

Plaintiffs Louisville Gas and Electric Company and Kentucky Utilities Company
have filed a motion for summary judgment on their claims that KRS 278.214 violates the
Commerce Clause and is preempted by supreme federal law. Because there are no issues
of material fact with respect to these constitutional claims, the Plaintiffs request that this
Court grant them judgment as a matter of law.

### INTRODUCTION

Plaintiffs Louisville Gas and Electric Company ("LG&E") and Kentucky Utilities
Company ("KU") seek a declaration that KRS 278.214 – and an Order of the Kentucky
Public Service Commission ("PSC") requiring LG&E and KU to file tariffs conforming
to that statute – violate the Commerce Clause and are preempted by Order 888 issued by

the Federal Energy Regulatory Commission ("FERC") and the FERC-approved tariff that governs the rights and duties of the Plaintiffs. KRS 278.214 discriminates in favor of Kentucky retail customers in the event that electricity transmission service must be curtailed, because it requires utilities to curtail service to Kentucky customers only after curtailing service to all other customers. Because this mandate purposefully discriminates in favor of in-state electricity customers, it violates the Commerce Clause of the U.S. Constitution. This mandate is also clearly preempted by FERC Order 888 and the Plaintiffs' federal tariff, both of which require utilities to curtail transmission service on a non-discriminatory basis regardless of the identity or geographical location of the customer.

# STATEMENT OF POINTS AND AUTHORITIES

STATEMENT OF THE CASE................................................................................. 1

    KRS 278.040 *et seq.*................................................................................. 1

    16 U.S.C. § 824(b) ................................................................................... 1

    Order 888, 61 Fed. Reg. 21,540 (1996) .................................................. 1

    *New York v. FERC*, 535 U.S. 1, 5-11 (2002) .......................................... 1

    Order 888, 61 Fed. Reg. at 21,543 (1996) .............................................. 1

    Order 888, 61 Fed. Reg. at 21,541 .......................................................... 2

    62 Fed. Reg. 12,274 (1997) ............................................................... 2, 3

    62 Fed. Reg. at 12,466 ............................................................................ 3

    18 C.F.R. § 35.28(c)................................................................................. 5

ARGUMENT...................................................................................................... 8

    The Kentucky statute violates the Commerce Clause because it
    purposefully discriminates in favor of Kentucky utility customers ............... 8

        A.    State statutes that purposefully discriminate in favor of
            local economic interests are per se invalid................................... 8

            *New Energy Co. v. Limbach*, 486 U.S. 269 (1988)........................ 8

            *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525 (1949).................. 8

            *E. Ky. Res. v. Fiscal Court of Magoffin County, Kentucky*, 127
            F.3d 532 (6th Cir. 1997) ........................................................ 8

            *Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ......................... 9

            *Or. Waste Sys., Inc. v. Envtl. Quality Comm. of the State of
            Oregon*, 511 U.S. 93 (1994)................................................... 9

            *Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .................................. 9

B.      **The Kentucky statute violates the Commerce Clause by purposefully discriminating in favor of in-state electricity customers** ................................................... 10

      *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532 (6th Cir. 1997)................................................................10

      *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)................................................................11, 12

C.      **The Federal Power Act does not authorize Kentucky to discriminate against out-of-state customers** ............................ 13

      *New England Power*, 455 U.S. at 340 .......................... 13

      *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983)...........................................................13

      *Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ............................... 13

**The Kentucky statute is preempted by supreme federal law**.......................... 14

      *Southeastern Oakland County Res. Recovery Auth. v. City of Madison Heights*, 5 F.3d 166 (6th Cir. 1993) ................................... 14

      *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir.) ........................ 14

      *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523 (6th Cir. 2002) ........................................................................... 14

A.      **KRS 278.214 is preempted because Congress has, through the Federal Power Act, occupied the field and expressly preempted state regulation of electricity transmission**................................................................ 15

      1.      **FERC has exclusive authority to regulate all transmissions of electric energy in interstate commerce** ........................................................................... 15

            *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)............................................................15

            *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997) .................. 15

            *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001)............................................... 16

*In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072 (S. D. Cal. 2003) ............................... 16

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ................... 16

*New York v. FERC*, 535 U.S. 1 (2002) ....................... 16, 17

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918 (9th Cir. 2002) ........................... 18

**2.      The Kentucky statute is preempted because it invades FERC's exclusive federal authority to regulate transmissions in interstate commerce** ........................... 18

*New York v. FERC*, 535 U.S. 1 (2002) ............................ 18

*In re California Wholesale Electricity Antitrust Litigation*, 244 F.Supp.2d 1072 (S.D. Cal. 2003) ................... 19

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997) ................. 19

*Pub. Utils. Comm'n of the State of Cal. v. Fed. Energy Reg. Comm'n*, 900 F.2d 269 (D.C. Cir. 1990) .............. 19

**B.    FERC Order 888 preempts KRS 278.214 because there is an actual conflict between the federal and state law provisions such that the Plaintiffs cannot comply with both** ........................................................................... 20

*Southeastern Oakland County Res. Recovery Auth. v. City of Madison Heights*, 5 F.3d 166 (6th Cir. 1993) ................... 20

*Interstate Towing Ass'n, Inc. v. City of Cincinnati, Ohio*, 6 F.3d 1154 (6th Cir. 1993)............................................. 20

*New York v. FERC*, 535 U.S. 1 (2002) ......................... 21

**C.    The PSC Order is preempted by the MISO tariff because it is a filed federal tariff that has been approved by FERC** ..................................................................... 22

*Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp.*, 805 F. Supp. 1277 (D.S.C. 1992)........................................22, 25

*County of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d 858 (9th Cir. 1997) ........................................................................ 22

*In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072
(S.D. Cal. 2003) ........................................................ 23, 24

*Pac. Gas & Elec. Co. v. Lynch*, 216 F. Supp.2d 1016 (N.D. Cal.
2002) ..................................................................... 23, 25

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953
(1986) .................................................................. 23, 24, 25

*Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 581-82 (1981) .............. 23

*Duke Energy Trading and Mktg, L.L.C. v. Davis*, 267 F.3d 1042
(9th Cir. 2001) ................................................................ 24

*ICOM Holdings, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219 (2nd
Cir. 2001) ...................................................................... 24

*Entergy Louisiana, Inc. v. Louisiana Public Service Commission*,
539 U.S. ___, 123 S.Ct. 2050 (2003) ................................ 24

*Miss. Power & Light Co. v. Thornburg*, 487 U.S. 354 (1988) ..... 25

*AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214 (1998) ............ 25

*Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341
U.S. 246 (1951) .............................................................. 25

*Transmission Agency of Northern California v. Sierra Pacific
Power*, 295 F.3d 918 (9th Cir. 2002) ................................ 26

**D.      The Eighth Circuit's decision in *Northern States Power*
does not undermine federal preemption of KRS 278.214
and the PSC Order** ........................................................ 28

*Northern States Power*, 176 F.3d 1090 (8th Cir. 1999) ................ 28

*New York v. FERC*, 535 U.S. 1 (1992) ............................. 28, 29, 30

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295
F.3d 918 (9th Cir. 2002) .................................................. 29

*Pub. Utils. Comm'n of the State of Cal. v. Fed. Energy Reg.
Comm'n*, 900 F.2d 269 (D.C. Cir. 1990) .......................... 29

**CONCLUSION** ................................................................ 30

## STATEMENT OF THE CASE

Plaintiffs LG&E and KU are electricity and gas utilities serving customers throughout Kentucky. (Compl. at ¶¶ 3-4) Plaintiffs are subject to the jurisdiction of the PSC, which regulates utilities under Kentucky law.[1] Each Plaintiff serves Kentucky retail customers within its "certified territory." *See* KRS 278.017; KRS 278.018; [Affidavit of Michael S. Beer, ¶ 3, attached as **Exhibit 1**] Each Plaintiff also sells electricity to, and transmits electricity of behalf of, customers in other states. [Beer Aff. ¶ 4] As electricity utilities engaged in transmissions and wholesale sales of electricity in interstate commerce, Plaintiffs are also subject to regulation by FERC under the Federal Power Act ("FPA").[2]

### FERC's enactment of Order 888 and the requirement of non-discrimination in transmission service.

On April 24, 1996, FERC issued Order 888,[3] which became final and effective on July 9, 1996. The stated purpose of Order 888 was to promote competition in the wholesale electricity market by ensuring equal access to transmission services.[4] In particular, FERC sought to "remedy undue discrimination in transmission services in interstate commerce and provide an orderly and fair transition to competitive bulk power markets."[5] Order 888 thus directed "all public utilities that own, control or operate

---

[1] *See generally* KRS 278.040 *et seq.*

[2] *See* 16 U.S.C. § 824(b).

[3] *See* Order 888, 61 Fed. Reg. 21,540 (1996). Order 888 has been succeeded and supplemented by Orders 888-A, 888-B, and 888-C. These Orders will be collectively referred to as Order 888, unless citation to a specific order is required.

[4] *See New York v. FERC*, 535 U.S. 1, 5-11 (2002).

[5] *See* Order No. 888, 61 Fed. Reg. at 21,543 (1996).

facilities used for transmitting electric energy in interstate commerce to file open access non-discriminatory transmission tariffs that contain minimum terms and conditions of non-discriminatory service."[6] FERC's authority to issue and enforce Order 888 was recently upheld by the Supreme Court in *New York v. Federal Energy Regulatory Commission.*[7]

Order 888-A, issued on March 4, 1997, sets forth a pro forma Open Access Transmission Tariff ("OATT") that must be followed by utilities regulated by FERC.[8] Paragraph 13.6 of the OATT addresses the procedure for curtailment or interruption of electricity transmission service in response to a transmission capacity shortfall. Paragraph 13.6 mandates non-discriminatory curtailment of electricity services to all customers. In the event of a capacity constraint, the pro forma tariff provides that transmission service must be curtailed to the provider's native load customers on the same terms as other customers who purchase transmission services on the transmission provider's network. Specifically, Paragraph 13.6 states:

> Curtailment of Firm Transmission Service: In the event that a Curtailment on the Transmission Provider's Transmission System, or a portion thereof, is required to maintain reliable operation of such system, Curtailments will be made on a *non-discriminatory basis* to the transaction(s) that effectively relieve the constraint. If multiple transactions require Curtailment, to the extent practicable and consistent with Good Utility Practice, the Transmission Provider will *curtail service to Network Customers and Transmission Customers taking Firm Point-To-Point Transmission Service on a basis comparable to the curtailment of*

---

[6] Order 888, 61 Fed. Reg. at 21,541. The full text of Order 888 is available on FERC's website at www.ferc.gov/legal/ferc-regs/land-docs/order888.asp.

[7] 535 U.S. 1, 122 S.Ct. 1012 (2002).

[8] *See* Pro Forma Tariff, Appendix B to Order 888-A, Appendix B, 62 Fed. Reg. 12,274 (1997). [**Appendix 1**] The full text of Order 888-A is available on FERC's website at www.ferc.gov/legal/ferc-regs/land-docs/order888.asp.

*service to the Transmission Provider's Native Load Customers. All Curtailments will be made on a non-discriminatory basis,* however, Non-Firm Point-To Point Transmission Service shall be subordinate to Firm Transmission Service. (emphasis supplied)[9]

The pro forma tariff's non-discriminatory curtailment provision contrasts "Native Load" customers with "Network" customers and "Firm Point-to-Point" customers. The terms Native Load Customer, Network Customer, and Firm Point-to-Point Transmission Service are defined terms.[10]   However, from a practical standpoint, a native load customer is simply a local retail or wholesale purchaser of power required to be served by a utility within its certified territory. [Beer Aff., ¶ 6]  The vast majority of the Plaintiffs' native load customers are individual households or businesses purchasing electricity at retail for their own consumption, although a small number are wholesale purchasers who then re-sell the power within Kentucky. *[Id., ¶¶ 6-7]*

By contrast, the vast majority of point-to-point customers are out-of-state customers who will use power transmitted on a provider's lines to serve their own native loads or to re-sell to other customers at wholesale. [Beer Aff., ¶ 7]  For this reason, point-

---

[9] Order 888-A, Appendix B, 62 Fed. Reg. at 12,470.

[10] "Native Load Customer" is defined as "[t]he wholesale and retail power customers of the Transmission Provider on whose behalf the Transmission Provider, by statute, franchise, regulatory requirement, or contract, has undertaken an obligation to construct and operate the Transmission Provider's system to meet the reliable electric needs of such customers." Order 888-A, Appendix B, ¶ 1.19, 62 Fed. Reg. 12,274, 12,466 (1997).

A "Network Customer" is "[a]n entity receiving transmission service pursuant to the terms of the Transmission Provider's Network Integration Transmission Service under Part III of the Tariff." Order 888-A, Appendix B, ¶ 1.20, 62 Fed. Reg. at 12,466.

"Firm Point-To-Point Transmission Service" is defined as "Transmission Service under this Tariff that is reserved and/or scheduled between specified Points of Receipt and Delivery pursuant to Part II of this Tariff." Order 888-A, Appendix B, ¶ 1.13, 62 Fed. Reg. at 12,466.

to-point customers are commonly referred to as "wholesale customers." [*Id.*] Therefore, a key feature of Paragraph 13.6 is that a utility subject to the tariff may not discriminate between its local retail and out-of-state wholesale customers when a curtailment of transmission service is required.

**FERC's approval of both the formation of the Midwest Independent Transmission System Operator and the MISO tariff**

In Order 888, FERC encouraged transmission-owning utilities such as LG&E and KU to explore participation in regional transmission systems administered by independent third-party operators to facilitate the provision of non-discriminatory, open access transmission services.[11] Accordingly, on January 14, 1998, Plaintiffs agreed to become members of the Midwest Independent System Transmission Operator ("MISO"), a regional entity created to manage and operate the transmission systems of multiple electric utilities in the midwest region. (Compl. at ¶¶ 12-15) On January 15, 1998, MISO sought FERC approval of its Open Access Transmission Tariff and the Midwest ISO Agreement among its member utilities.[12]

---

[11] As part of its effort to make the wholesale power market more competitive, FERC encouraged the establishment of Regional Transmission Organizations ("RTOs") that would be able to sell power at a single regional price. *See* Order No. 2000, 65 Fed. Reg. 809 (2000). *See also Submitted Committee Report: Report of the Antitrust Committee*, 24 ENERGY L. J. 157, 170 (2003).

[12] Letter from Michael E. Small, Barry S. Specter, and Paul M. Flynn to Hon. David P. Boergers, Docket No. ER98-1438-000. [**Appendix 2**] This letter sets forth the basis for approval of MISO's OATT and the Midwest ISO Agreement and By-laws. The entire filing (in excess of 900 pages), including the proposed tariff can be obtained on FERC's website at www.ferc.gov/docs-filing/elibrary.asp.

The PSC actively participated in the FERC proceedings and objected to various aspects of the MISO.[13]  Among other things, the PSC was "very concerned" that MISO's pricing proposal would "1) cede state jurisdiction over bundled retail load to FERC, and 2) require low cost transmission areas to subsidize high cost areas."[14]

On September 16, 1998, FERC conditionally approved the establishment of MISO and accepted for filing its Open Access Transmission Tariff.[15]  FERC also approved the Plaintiffs' applications to transfer functional control over their transmission lines to MISO, which gave MISO the independent authority to schedule transmissions and required ancillary services.  (Compl. at ¶¶ 12-15)

As required by FERC regulations,[16] MISO's Open Access Transmission Tariff is modeled on the Order 888 pro forma tariff. (Compl. at ¶14)  Specifically, the curtailment provisions of the MISO tariff track the corresponding provisions in the FERC pro forma tariff by providing for "non-discriminatory" curtailment of transmission services to all customers, whether or not they are part of the provider's native load.[17]  One important difference is that, under the MISO tariff, MISO members are automatically subject to a penalty of $10/kWh of load that is not curtailed within 10 minutes of being ordered to do

---

[13] Notice of Intervention and Protest of the Public Service Commission of Kentucky, Docket No. ER98-1438-000, 3/16/98. **[Appendix 3]**

[14] *See id.*, p. 2.

[15] Order Conditionally Authorizing Establishment of Midwest Independent Transmission System Operator and Establishing Hearing Procedures, Docket Nos. ER98-1438-000 and EC-98-24-000, 9/16/98. **[Appendix 4]**

[16] 18 C.F.R. § 35.28(c); Order 888, 61 Fed.Reg. 21693.

[17] Open Access Transmission Tariff for the Midwest Independent Transmission System Operator, Inc., First Revised Volume No. 1, Original Sheet Nos. 44-45. **[Exhibit 2]**

so by MISO, and $20/kWh of load not curtailed within 20 minutes. (Compl. at ¶15; MISO Tariff, ¶ 13.6, at **Exhibit 2**) These monetary penalties are payable directly to MISO. (*Id.*)

### The Kentucky Legislature's enactment of Senate Bill 257 requiring that Kentucky customers receive priority in the event of curtailment

During the 2002 Regular Session, the Kentucky General Assembly passed Senate Bill 257 (codified as KRS 278.214), which gives Kentucky customers within utilities' certified territories the highest priority in a transmission emergency. This provision directly conflicts with Order 888's requirement of non-discriminatory curtailments. Under the statute, service to Kentucky customers may be curtailed only after service to all other customers has been curtailed:

> When a utility or generation and transmission cooperative engaged in the transmission of electricity experiences on its transmission facilities an emergency or other event that necessitates a curtailment or interruption of service, the utility or generation and transmission cooperative *shall not curtail or interrupt retail electric service within its certified territory,* or curtail or interrupt wholesale electric energy furnished to a member distribution cooperative for retail electric service within the cooperative's certified territory, except for customers who have agreed to receive interruptible service, *until after service has been interrupted to all other customers whose interruption may relieve the emergency or other event.*

KRS 278.214 (emphasis added). In sharp contrast to the non-discriminatory curtailment provisions of FERC Order 888, KRS 278.214 facially and purposefully discriminates in favor of Kentucky customers in the event that a curtailment of electricity transmission service by a regulated utility is required.

On June 24, 2002, the PSC directed all electric utilities subject to its jurisdiction, including the Plaintiffs, to file tariffs to implement the new requirements of KRS 278.214. On August 29, 2002, the Plaintiffs filed new tariffs, which stated that they

would comply with KRS 278.214, but only to the extent that compliance would not force them to violate the terms of the MISO tariff or federal regulations.[18] (Compl. at ¶¶ 17-18)

The PSC suspended the tariffs filed by the Plaintiffs while the PSC investigated whether the tariffs satisfied the requirements of KRS 278.214.[19] The Plaintiffs asserted before the PSC that KRS 278.214 was preempted by federal law under the Supremacy Clause of the United States Constitution.[20] On May 28, 2003, the PSC issued an order finding that the tariffs failed to satisfy KRS 278.214 and concluding, "even if there were a constitutional problem with KRS 278.214, this agency is not empowered by law to declare a statute void on constitutional grounds."[21] The PSC therefore ordered the Plaintiffs to file "new tariffs setting forth without qualification the expressed transmission priorities required by KRS 278.214."[22]

Under protest, on July 18, 2003, Plaintiffs filed tariffs that conform to KRS 278.214, and which directly conflict with the requirements of the FERC-approved MISO tariff. (Compl. at ¶ 22) LG&E and KU subsequently initiated protective appeals by filing separate Complaints for Review of the Order of the PSC in Franklin Circuit Court.[23]

---

[18] Original Sheet No. 37-A; Original Sheet No. 31.3 **(Exhibit 3)**

[19] *In re Investigation of the Tariff Filing by Louisville Gas & Elec.*, Case No. 2002-00345, 5/28/03) (hereinafter "PSC Order") **(Exhibit 4)**

[20] *Id.* at 3.

[21] PSC Order, at 5.

[22] *Id.* at 6.

[23] *Louisville Gas & Elec. Co. v. Ky. Pub. Serv. Comm'n*, No. 03-CI-00891; *Ky. Util. Co. v. Ky. Pub. Serv. Comm'n*, No. 03-CI-00890.

On that same day, Plaintiffs filed this action seeking declaratory and injunctive relief to set aside the PSC order on the grounds that KRS 278.214: (1) is preempted by federal law and (2) violates the Commerce Clause of the United States Constitution.

## ARGUMENT

I.   **The Kentucky statute violates the Commerce Clause because it purposefully discriminates in favor of Kentucky utility customers.**

A.   **State statutes that purposefully discriminate in favor of local economic interests are per se invalid.**

The Commerce Clause of the United States Constitution provides that "[t]he Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." Article I, § 8, cl. 3. "It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* The Commerce Clause therefore forbids states from "advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 535 (1949).

State statutes may be found to discriminate against out-of-state interests facially, purposefully, or in practical effect. *E. Ky. Res. v. Fiscal Court of Magoffin County, Kentucky*, 127 F.3d 532, 540 (6th Cir. 1997), *cert. denied*, 523 U.S. 1072 (1998). Facially discriminatory statutes are presumptively illegal, "because these laws are almost always reflective of a state's attempt to isolate itself from the national economy and to protect

- 8 -

local economic actors." *Id.* Moreover, "[i]t is axiomatic that a state law that purposefully discriminates against out-of-state interests is unconstitutional." *Id.* at 541. Indeed, "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *accord Or. Waste Sys., Inc. v. Envtl. Quality Comm. of the State of Oregon*, 511 U.S. 93, 99 (1994) ("If a restriction on commerce is discriminatory, it is virtually *per se* invalid.").

The Supreme Court has repeatedly applied the per se rule of invalidity to strike down state laws that discriminate in favor of in-state economic interests. For example, in *Philadelphia v. New Jersey, supra*, the Court held that New Jersey could not ban the importation of out-of-state waste because the statute "impose[d] on out-of-state commercial interests the full burden of conserving the State's remaining landfill space." 437 U.S. at 628. Similarly, in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), the Court held that Oklahoma could not require coal-fired electric utilities to burn a mixture consisting of 10% Oklahoma coal, because this constituted a discriminatory preference for domestic coal. *Id.* at 455. Finally, in *Oregon Waste Systems, Inc., supra*, the Court held that Oregon could not impose a surcharge on the disposal of waste generated outside of the state, because "the differential charge favors shippers of Oregon waste over their counterparts handling waste generated in other states." 511 U.S. at 100.

These precedents establish that a state statute that purposefully discriminates in favor of in-state interests is per se invalid and cannot survive scrutiny under the Commerce Clause.

**B.    The Kentucky statute violates the Commerce Clause by purposefully discriminating in favor of in-state electricity customers.**

The challenged Kentucky statute provides that a public utility "shall not curtail or interrupt retail electric service within its certified territory . . . until after service has been interrupted to all other customers whose interruption may relieve the emergency or other event." KRS 278.214.[24] On its face, this statute discriminates in favor of Kentucky utility customers and against out-of-state customers. The statute only applies to public utilities like LG&E and KU which are located in Kentucky and regulated by the PSC. *See* KRS 278.040(2). Moreover, the statute extends its protections only to customers within a regulated utility's "certified territory" and therefore excludes customers outside that territory. Because the certified territories of LG&E and KU are entirely within Kentucky [Beer Aff., ¶ 3], it is clear that the Kentucky customers being served within those areas are the only persons protected by the statute. Conversely, it is clear that out-of-state purchasers of electricity and transmission services do not reside within the certified territory and, therefore, are excluded from the protections of the statute. Therefore, the Kentucky statute facially discriminates in favor of Kentucky citizens and against citizens of other states who receive transmission service from Kentucky-regulated utilities.

This discrimination in favor of Kentucky customers under KRS 278.214 is not incidental but clearly purposeful. "'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.'" *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532,

---

[24] "Retail electric service" means "electric service furnished to a consumer for ultimate consumption, but does not include wholesale electric energy furnished by an electric supplier to another electric supplier for resale." KRS 278.010(7).

542 (6th Cir. 1997), *cert. denied*, 523 U.S. 1072 (1998).[25] The obvious and sole purpose of the statute is to protect the reliability of service to Kentucky customers by requiring utilities to disrupt service to non-Kentucky customers first. Indeed, the PSC has flatly stated that "KRS 278.214 simply protects Kentucky ratepayers' interest in transmission facilities which were built to serve their needs . . . ." PSC Order, at 5, **Exhibit 4**][26] Thus, the Kentucky statute admittedly is a protectionist measure that works to the detriment of out-of-state customers who purchase electricity at wholesale from LG&E and KU, as well as the retail customers in other states served by them. The Kentucky statute therefore cannot survive scrutiny under the Commerce Clause.

The decision of the United States Supreme Court in *New England Power Co. v. New Hampshire*[27] is directly on point. In that case, the New Hampshire Public Utilities Commission ordered New England Power to stop exporting hydroelectric power to neighboring states in order to reserve this cheaper power supply for New Hampshire residents. *Id.*, 455 U.S. at 335-36. The Commission issued this order under a state statute that empowered the Commission to prohibit the export of electricity upon a determination that the power was "'reasonably required for use within [New Hampshire] and that the public good requires that it be delivered for such use.'" *Id.* at 335. The Supreme Court concluded that the order of the Commission pursuant to this statute violated the Commerce Clause:

---

[25] *quoting Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966).

[26] In several places the PSC Order refers to the "protections" afforded to Kentucky customers by KRS 278.214. *See* PSC Order, at 2, 3, 4.

[27] 455 U.S. 331 (1982).

> The order of the New Hampshire Commission, prohibiting New England Power from selling its hydroelectric energy outside the State of New Hampshire, is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states. The Commission has made clear that its order is designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states. Moreover, it cannot be disputed that the Commission's "exportation ban" places direct and substantial burdens on transactions in interstate commerce. *See Public Utilities Comm'n v. Attleboro Steam & Electric Co.,* 273 U.S. 83 (1927). Such state-imposed burdens cannot be squared with the Commerce Clause when they serve only to advance "simple economic protectionism." *Philadelphia v. New Jersey,* [437 U.S.] at 624.

*Id.* at 339.

Likewise, in this case, the PSC has, pursuant to KRS 278.214, issued an order requiring LG&E and KU to curtail transmissions of electric power to their Kentucky retail customers only after they have first curtailed transmissions to all other customers. The sole purpose of the Kentucky statute is to ensure that Kentucky residents receive uninterrupted transmission service in the event that a utility is required to curtail transmission service in an emergency. The obvious impact of the statute is to disadvantage out-of-state customers by placing the entire burden of any curtailment upon them.

The Commerce Clause "precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power,* 455 U.S. at 339. That is precisely what KRS 278.214 does. The Kentucky statute mandates that Kentucky citizens will have a preferred right of access to transmission service in the event of a temporary scarcity of that service, a result forbidden by the Commerce Clause.

**C.     The Federal Power Act does not authorize Kentucky to
       discriminate against out-of-state customers.**

The PSC cannot contend that this discrimination in favor of Kentucky customers

is authorized by the Federal Power Act, because that contention has been repeatedly

rejected by the Supreme Court.  While Congress may use the Commerce Power to give

states the power "to restrict the flow of interstate commerce that they would not

otherwise enjoy," *New England Power*, 455 U.S. at 340, the Supreme Court has squarely

held that Congress did not so empower the states in the Federal Power Act. *See New*

*England Power, supra; Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375

(1983); *Wyoming v. Oklahoma, supra.*

In *Wyoming v. Oklahoma,* the most recent affirmation of this principle, Oklahoma

passed a law discriminating in favor of local coal producers by requiring in-state

electricity providers to utilize local coal. *Id.*, 502 U.S. at 457.  Oklahoma argued that it

was empowered to discriminate because the "savings clause" of the Federal Power Act

"reserves to the States the regulation of local retail electric rates." *Id.*[28]  The Court

rejected this argument on the grounds that nothing in the Federal Power Act or its

legislative history demonstrated a Congressional intent to "'alter the limits of state power

otherwise imposed by the Commerce Clause.'" *Id.* at 458.[29]  The "savings clause" merely

---

[28] 16 U. S. C. § 824(b)(1) provides: "The provisions of this subchapter shall apply to the
transmission of electric energy in interstate commerce and to the sale of electric energy at
wholesale in interstate commerce, but except as provided in paragraph (2) **shall not
apply to any other sale of electric energy** or deprive a State or State commission of its
lawful authority now exercised over the exportation of hydroelectric energy which is
transmitted across a State line." (emphasis added).   By its terms, this provision
establishes exclusive federal authority over wholesale sales and transmissions of electric
energy in interstate commerce but "reserves to the States the regulation of local retail
electric rates." *Wyoming v. Oklahoma*, 502 U.S. at 457.

[29] *quoting New England Power Co.*, 455 U.S. at 341.

preserves preexisting state authority to regulate local rates and does not constitute an affirmative grant of power to discriminate against interstate commerce. *Id.* Thus, Oklahoma could not meet "its burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the discrimination against interstate commerce occurring [there]." *Id.*

Because KRS 278.214 discriminates against interstate commerce, and the discrimination has not been authorized by Congress, the statute is void under the Commerce Clause.

## II. The Kentucky statute is preempted by supreme federal law.

"The Constitution and laws of the United States are the supreme law of the land, U.S. Const. art. VI, cl. 2; therefore, if state law conflicts with federal law, the state law is preempted." *Southeastern Oakland County Res. Recovery Auth. v. City of Madison Heights*, 5 F.3d 166, 169 (6th Cir. 1993). "The focus of a preemption inquiry is on congressional intent." *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 783 (6th Cir.), *cert. denied*, 519 U.S. 823 (1996). The Sixth Circuit has recognized three basic types of preemption:

(1) express preemption where the intent of Congress to preempt state law is clear and explicit; (2) field preemption where Congress' regulation of a field is so pervasive or the federal interest is so dominant that an intent can be inferred for federal law to occupy the field exclusively; and (3) conflict preemption, where federal and state law so conflict that it is impossible for a party to comply with both simultaneously, or where enforcement of state law prevents the accomplishment of the full purposes and objectives of federal law.

*R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 561 (6th Cir. 2002).

In this instance, the Kentucky statute and the PSC Order are clearly preempted by federal law. **First,** through the Federal Power Act, Congress has both **occupied the field**

and **expressly preempted** any state regulation of transmissions of electric power in interstate commerce. Because KRS 278.214 attempts to regulate these transmissions, it is preempted by the Federal Power Act. **Second,** KRS 278.214 and the PSC Order **directly conflict** with FERC Order 888 and the MISO tariff. Because the Plaintiffs cannot comply with both federal and state law, the Kentucky statute and PSC order must yield to supreme federal law.

> **A.    KRS 278.214 is preempted because Congress has, through the Federal Power Act, occupied the field and expressly preempted state regulation of electricity transmission.**

> **1.    FERC has exclusive authority to regulate all transmissions of electric energy in interstate commerce.**

Under the Federal Power Act, Congress gave FERC jurisdiction over (1) "the transmission of electric energy in interstate commerce" and (2) "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b).[30]   As explained by the Supreme Court, the Federal Power Act delegates to the FERC "*exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 334 (1982) (emphasis added); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1173 (9th Cir. 1997) ("Interstate transmission [of electricity] is clearly a federal matter.") Thus, "FERC's exclusive jurisdiction extends over all facilities for such

---

[30] When Congress enacted these provisions, it "authorized federal regulation of electricity in areas beyond the reach of state power, such as the gap identified in *Attleboro*, but it also extended that federal coverage to some areas that previously had been state regulated. *New York v. FERC*, 535 U.S. 1, 6. The so-called "Attleboro gap" was created by the Supreme Court's decision in *Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927), which invalidated Rhode Island's attempt to regulate sales by a Rhode Island utility to a wholesale buyer in Massachusetts on Commerce Clause grounds. The "Attleboro gap" was later filled by the Federal Power Act.

transmission or sale of electric energy." *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1056 (9th Cir. 2001), *cert. denied*, 535 U.S. 1112 (2002).

Congress reserved to the states authority over **retail sales** of electricity. *Duke Energy*, 267 F.3d at 1056; *In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072, 1082 (S. D. Cal. 2003) ("The only authority granted to the states under the FPA is over intrastate retail electricity sales.") This reservation of state authority over retail sales was accomplished by means of a "savings clause" in the FPA:

> The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) **shall not apply to any other sale of electric energy** or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line.

16 U.S.C. § 824(b)(1) (emphasis added). By its terms, this provision establishes exclusive federal authority over wholesale sales and transmissions of electric energy in interstate commerce, but "reserves to the States the regulation of local retail electric rates." *Wyoming v. Oklahoma, supra*, 502 U.S. at 457.

The line between federal and state regulation was recently clarified in the landmark decision of *New York v. FERC*, 535 U.S. 1 (2002), which specifically upheld FERC's authority to issue and enforce Order 888, the FERC order at issue in this case. In *New York v. FERC*, plaintiffs challenged various aspects of Order 888's non-discriminatory open access requirements. Several states challenged the requirement that each utility subject to FERC jurisdiction must allow its competitors to transmit energy over the utility's lines on the same terms that it offers to its own customers. *Id.* at 16. Enron challenged FERC's decision to apply this requirement only to retail sales in which

the cost of the energy was "unbundled" from the cost of its transmission. *Id.* The Court

upheld FERC's decision to regulate **unbundled** retail transmissions, as well as its

decision not to regulate the transmission component of a **bundled** retail sale. *Id.* at 23-24,

28.

In *New York v. FERC*, there was no question that FERC had the authority to

regulate the terms of **wholesale sales** in interstate commerce. The issue was whether

FERC could regulate a **transmission** connected to a **retail sale**. *Id.* at 16.

In resolving the issue, the Court accepted the factual premise that "any activity on

the [nation's power] grid affects the rest of the grid." *New York v. FERC*, 535 U.S. 1, 8

fn. 5.[31] Accordingly, the Supreme Court "agree[d] with FERC that transmissions on the

interconnected national grids constitute transmission in interstate commerce." *Id.* at 16

*citing FPC v. Fla. Power & Light Co.*, 404 U.S. 453, 466-67 (1972). Because all

transmissions onto the national grid are transmissions in interstate commerce, the Court

held that FERC had clear statutory authority to regulate the transmission component of an

unbundled retail sale. *Id.* at 20, 23-24. The Court further held that it was a permissible

policy choice for FERC to choose not to regulate the transmission component of a

bundled retail sale. *Id.* at 27-28.

After *New York v. FERC*, there is no doubt that the Federal Power Act gives

FERC exclusive jurisdiction to regulate **any** transmission onto the national power grid.

---

[31] In the United States, electricity is now delivered over three major networks or "grids":
the Eastern Interconnect, the Western Interconnect, and the Texas Interconnect. *Id.* at
1018. The Eastern and Western Interconnects are connected to each other. *Id.* "It is only
in Hawaii and Alaska, and on the Texas Interconnect, that electricity is distributed
entirely within a single state." *Id.* In the rest of the country, including Kentucky, "**any
electricity that enters the grid** immediately becomes a part of a vast pool of energy that
is constantly moving in interstate commerce. *Id.* (emphasis added).

This holds true even if the transmission is part of a retail sale to a local retail customer, because "as the Supreme Court has recently explained, FERC's jurisdiction over electricity transmission, unlike its jurisdiction over sales (i.e. rates) can reach *intrastate* transmissions." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 931 fn. 9 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2272 (2003) *citing New York v. FERC*, 535 U.S. 1 (2002). Because Kentucky is located on the interconnected grid, transmissions by utilities that use the grid, such as LG&E and KU, and RTOs such as MISO, fall within FERC's exclusive authority.

### 2. The Kentucky statute is preempted because it invades FERC's exclusive federal authority to regulate transmissions in interstate commerce.

By its terms, KRS 278.214 necessarily regulates transmissions occurring in interstate commerce. The Kentucky statute regulates situations in which a utility "engaged in the **transmission of electricity** experiences on its transmission facilities an emergency or other event that necessitates a curtailment or interruption of service . . . ." KRS 278.214. Under the statute, a utility may not interrupt transmission service to its local customers until it has first attempted to solve the problem by curtailing all other customers. *See id.* With respect to utilities such as LG&E and KU, who transmit electricity onto the nation's power grid, the Kentucky statute necessarily regulates transmissions in interstate commerce. *See New York v. FERC*, 535 U.S. 1, 8 fn. 5, 16 (2002). KRS 278.214 therefore intrudes into regulatory territory over which FERC has exclusive jurisdiction. Because Congress has occupied the field of regulation with respect to **interstate transmissions** of electric energy, KRS 278.214 is preempted.

- 18 -

A recent illustrative precedent is *In re California Wholesale Electricity Antitrust Litigation*, 244 F.Supp.2d 1072 (S.D. Cal. 2003). In that case, a public utility sued energy sellers alleging that their unfair business practices and energy market manipulation had led to excessive wholesale energy prices. *Id.* at 1075. The court observed that, by enacting the Federal Power Act, Congress had "occupied the field" with respect to the regulation of interstate wholesale electricity rates. *Id.* at 1081. Accordingly, "the fact that FERC maintains exclusive jurisdiction over interstate wholesale electricity rates indicates Plaintiffs' state law claims are barred under the doctrine of field preemption." *Id.* at 1082. Likewise, in this case, FERC has exclusive authority to regulate transmissions of electricity in interstate commerce, pursuant to the Federal Power Act. 16 U.S.C. § 824(b). KRS 278.214 is therefore preempted, because it purports to regulate within an exclusive sphere of federal jurisdiction. *E.g., Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1173 (9th Cir. 1997) ("Interstate transmission [of electricity] is clearly a federal matter.")

It is immaterial that FERC has, in Order 888, chosen for the present not to regulate the transmission component of bundled retail sales. This does not permit Kentucky to step in and regulate in an area where federal authority is exclusive. Indeed, "if there be Commission jurisdiction over some component of the transaction, it is exclusive over that component." *Pub. Utils. Comm'n of the State of Cal. v. Fed. Energy Reg. Comm'n*, 900 F.2d 269, 274 (D.C. Cir. 1990). Conversely, Kentucky's authority to regulate retail sales does not justify encroachment into FERC's authority to regulate transmissions in interstate commerce. "[E]ven where state regulation operates within its own field, it may not intrude 'indirectly' on areas of exclusive federal jurisdiction." *Id.* at

fn. 2. The determinative factor for the purposes of field preemption is whether Congress has foreclosed state regulation in a particular area. There can be no question that the Federal Power Act has done so with respect to transmissions in interstate commerce. *See* 16 U.S.C. § 824(b). Because KRS 278.214 and the PSC Order intrude into a regulatory field that Congress has assigned exclusively to FERC, those state law provisions are preempted.

## B. FERC Order 888 preempts KRS 278.214 because there is an actual conflict between the federal and state law provisions such that the Plaintiffs cannot comply with both.

The Kentucky statute is also preempted due to an irreconcilable conflict with FERC Order 888. "When Congress has not stated its intent to preempt expressly, such intent may be inferred from an actual conflict between the federal and state laws." *Southeastern Oakland County Res. Recovery Auth. v. City of Madison Heights*, 5 F.3d 166, 169 (6th Cir. 1993). "An actual conflict exists where compliance with both the federal and the state law is impossible, or where the state law stands as an obstacle to achievement of the goals of Congress." *Id.* "Regulations promulgated by a federal agency that conflict with state law preempt state law in the same manner as do specific acts of Congress." *Interstate Towing Ass'n, Inc. v. City of Cincinnati, Ohio*, 6 F.3d 1154, 1157 (6th Cir. 1993).

In this instance, the federal and state law provisions are diametrically opposed. Order 888 requires all utilities subject to its jurisdiction to file a tariff providing that any curtailment of transmission service must be made on a "non-discriminatory" basis. (Appendix B, Pro Forma Open Access Transmission Tariff, ¶ 13.6, **Appendix 1**) In the event that a utility is forced to curtail multiple transactions, service to wholesale

customers must be curtailed "on a basis comparable to" the curtailment of service to local retail customers. (*Id.*)

By contrast, KRS 278.214 mandates that, under the same circumstances, a utility may not curtail service to its local retail customers "until after service has been interrupted to all other customers whose interruption may relieve the emergency or other event." *Id.* The Kentucky statute therefore affords local retail customers a higher level of priority than out-of-state wholesale customers. In a situation in which multiple transactions must be curtailed, it would be impossible for a utility to comply with both Order 888 and KRS 278.214. This is because a utility cannot curtail service to all customers on an equal basis and simultaneously curtail service to local customers only after service has been curtailed to all other customers.

It is immaterial to conflict preemption that FERC has not applied certain aspects of Order 888 to bundled retail sales of electricity. FERC's policy decision not to regulate bundled retail applies only to the requirement in Order 888 that a utility "transmit competitors' electricity over its lines on the same terms that the utility applies to its own energy transmissions." *New York v. FERC*, 535 U.S. at 4. *New York v. FERC* did not address the curtailment provision in Order 888 that is at issue in this case. Paragraph 13.6 of the MISO tariff does not distinguish between bundled and unbundled retail transmissions and therefore, by its terms, applies to both. See ¶ 13.6 (Curtailment of Firm Transmission Service) and ¶ 1.19 (Definition of Native Load Customer). Moreover, in Order 888-A, FERC considered and rejected the argument that "transactions subject to proportional curtailment should not include a transmitting utility's own use of its system to transmit its owned and purchased generation to native load customers as part of

bundled retail service . . . ." Order No. 888-A, pp. 103-04. [**Exhibit 5**][32]  FERC

determined that that curtailment provision should stand because it "simply requires the

transmission provider to curtail network and point-to-point transmission services on a

basis comparable to the curtailment of the transmission provider's service to its native

load." *Id.* at 105. It is clear that FERC intended for Paragraph 13.6 of the MISO tariff to

apply regardless of whether the transmission was a part of a bundled retail transaction.

The mandates of Order 888 and KRS 278.214 are entirely incompatible. There is

no way to avoid this conflict. Accordingly, under the Supremacy Clause, Order 888 –

and the MISO tariff approved pursuant to Order 888 – preempt the inconsistent state law

requirements.

## C. The PSC Order is preempted by the MISO tariff because it is a filed federal tariff that has been approved by FERC.

The MISO tariff also directly preempts the conflicting PSC Order under the "filed

rate doctrine." Generally, "[u]nder the filed rate doctrine, tariffs filed with [a federal

agency] are binding, have the force of law, and are lawful for all purposes, unless

declared unlawful or unreasonable by [that federal agency]." *Lifschultz Fast Freight, Inc.*

*v. Consol. Freightways Corp.*, 805 F. Supp. 1277, 1295 (D.S.C. 1992), *aff'd without*

*opinion*, 998 F.2d 1009 (4th Cir.), *cert. denied*, 510 U.S. 993 (1993) *citing Keogh v.*

*Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922). Accordingly, "[t]he filed rate

doctrine bars all claims – state and federal – that attempt to challenge a rate that a federal

agency has reviewed and filed." *County of Stanislaus v. Pac. Gas & Elec. Co.*, 114 F.3d

858, 863 (9th Cir. 1997), *cert. denied*, 522 U.S. 1076 (1998).

---

[32] "Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recover of Stranded Costs by Public Utilities and Transmitting Utilities, 78 FERC 61,220.

"The filed rate doctrine, in the electricity context, results from FERC's responsibility for setting and ensuring compliance with just and reasonable rates of wholesale electricity sale and transmission." *In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072, 1077 (S.D. Cal. 2003). "[T]he right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, *except for review of the Commission's orders*, the court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Pac. Gas & Elec. Co. v. Lynch*, 216 F. Supp.2d 1016, 1034 (N.D. Cal. 2002) (emphasis added) *citing Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951). Accordingly, "[o]nce FERC sets [a wholesale] rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A state must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Id. citing Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). Therefore, "electricity generators who file their rates with FERC, as they are required to do by law, are insulated from lawsuits challenging those rates and from court orders having the effect of imposing a rate other than that filed by FERC." *Id.*

When the party challenging a filed federal tariff is a state court or regulatory agency, judicial enforcement of the filed rate doctrine is "a matter of enforcing the Supremacy Clause." *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963 (1986); *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 581-82 (1981) (Supremacy Clause would not permit state court to award damages based on a higher rate and therefore "usurp[] a function that Congress has assigned to a federal regulatory body.")

Accordingly, the Supreme Court has repeatedly applied the filed rate doctrine to strike down state utility commission orders that conflict with a FERC-approved tariff.

These principles apply with equal force to a state challenge to any aspect of a filed federal tariff, whether or not the issue is the filed rate. Indeed, it is settled law that "the filed rate doctrine is not limited to 'rates' *per se*. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986); *accord Duke Energy Trading and Mktg, L.L.C. v. Davis*, 267 F.3d 1042, 1056 (9th Cir. 2001), *cert. denied*, 535 U.S. 1112 (2002). Rather, the doctrine also applies to "various nonprice aspects [of the filed tariff], such as service, provisioning, and billing options . . ." *ICOM Holdings, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 222 (2nd Cir. 2001). This is because "FERC's exclusive jurisdiction extends not only to rates per se, but also to 'any rule, regulation, practice or contract affecting such' rates." *In re Cal. Wholesale*, 244 F.Supp.2d 1072, 1076 (S.D. Cal. 2003).

A recent illustrative precedent is *Entergy Louisiana, Inc. v. Louisiana Public Service Commission*, 539 U.S. ___, 123 S.Ct. 2050 (2003). In that case, Entergy's operating companies had an arrangement under which they allocated among themselves the costs of buying and selling energy within the group. The state commission refused to allow the pass-through costs incurred under the agreement to be recovered in the local retail rate. The Supreme Court held that "under the filed rate doctrine, FERC-approved cost allocations . . . may not be subjected to reevaluation in state ratemaking proceedings." *Id.* at 2053 *citing Nantahala*, 476 U.S. at 967-69 and *Miss. Power & Light Co. v. Thornburg*, 487 U.S. 354, 374 (1988). Accordingly, because the arrangement was approved in a FERC tariff, the state order was preempted. "It matters not whether FERC

has spoken to the precise" issue, but instead "only whether the FERC tariff dictates" the issue. *Id.* at 2057.[33]

Likewise, in this instance, FERC approved the MISO tariff, including the curtailment provisions in Paragraph 13.6, after a full hearing in which the PSC participated. Numerous issues with respect to the tariff were raised by participants in the proceedings and thoroughly addressed by FERC in its Order approving the MISO and the tariff. [FERC Order, 9/16/98, **Appendix 4**] Because the MISO tariff has been approved by FERC, it has the force and effect of law and conclusively establishes the rights and obligations of MISO, its transmission-owning members, and third parties with respect to all matters covered by the tariff. *Pac. Gas & Elec. Co.*, 216 F. Supp.2d at 1034; *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp.*, 805 F. Supp. 1277, 1295 (D.S.C. 1992), *aff'd without opinion*, 998 F.2d 1009 (4th Cir.), *cert. denied*, 510 U.S. 993 (1993). Under the filed tariff doctrine, the terms of service contained in the MISO tariff are legally binding on all future transactions. *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214 (1998). Thus, the nondiscriminatory curtailment procedure approved by FERC is law and, "except for review of the Commission's orders, the courts can assume no right to a different [procedure] on the ground that, in its opinion, it is the only or the more reasonable one." *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951).

---

[33] *See also Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 967-69 (1986) (wholesale electricity rate set by FERC based on power-sharing agreement between hydroelectric powerplants could not be questioned by state utility commission in setting local rates) and *Miss. Power & Light Co. v. Thornburg*, 487 U.S. 354, 374 (1988) (state utility commission was required to accept allocation to utility of high-cost wholesale power purchases that were in a FERC-approved tariff).

Although the PSC was an active participant in the FERC proceedings leading to the approval of the MISO tariff [**Appendix 3**], the PSC never questioned the curtailment provision before the FERC. Instead, years after the initial approval of the MISO tariff, the PSC issued an order requiring LG&E and KU to file state tariffs that directly conflict with the service curtailment procedure set forth in Paragraph 13.6. Under the filed rate doctrine, the PSC may not collaterally attack the federal tariff in this manner, but must accept the MISO tariff as supreme federal law, until the tariff is modified by FERC or a federal court reviewing a FERC order.

Under the reasoning of *Transmission Agency of Northern California v. Sierra Pacific Power*,[34] the PSC Order is also preempted because it directly conflicts with FERC's authority, exercised under Order 888, to regulate interstate wholesale electricity rates. In *Transmission Agency of Northern California*, a group of municipalities sued several regional utility companies alleging state law claims in tort and breach of contract. The claims stemmed from allegations that the operation of a federally-approved system for transmission of electricity had reduced the municipalities' previously contracted-for allocation of electricity. *Id.* at 927-28.

The court held that that the state law claims were preempted based on the exclusive authority of FERC to regulate facilities for the transmission of electric energy in interstate commerce. The court specifically found that the breach of contract claims were preempted because they were based on the assumption that, absent the breach, FERC would have continued to allocate a certain level of transmission capacity to the plaintiffs. *Id.* at 929. Because wholesale rates and the allocation of transmission capacity

---

[34] 295 F.3d 918 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2272 (2003).

are intertwined under Order 888, the allocation of capacity was also subject to exclusive

federal jurisdiction:

> FERC Order No. 888 has functionally combined FERC regulation of rates with FERC regulation of transmission capacity. The Order accomplishes this because it regulates rates not by setting them directly, but rather by setting rules requiring open access to transmission lines at uniform, openly disclosed, rates. *See id.* at 21,541; *see also* 18 C.F.R. § 35.28 (implementing the nondiscriminatory open access transmission tariff policy). These open policies as to transmission capacity, FERC expects, will result in rates set at a competitive level. *See 61 Fed. Reg. at 21,541.* Thus, ***FERC's regulation of interstate rates now operates through FERC's regulation of open access to transmission capacity. For that reason, any right to a particular allocation of interstate transmission capacity must now be considered an exclusive matter of federal law.*** To conclude otherwise would restrict FERC's ability to regulate rates through its open transmission policy. We therefore hold that FERC's exclusive jurisdiction over the interstate transmission of electricity extends to any claims of entitlement to a specific allocation of interstate transmission capacity . . . .

*Id.* (emphasis added).

Likewise, in this case, Kentucky is attempting to secure for Kentucky retail customers a particular allocation of electric power in the event of an emergency requiring a curtailment of transmission service. As with the other mandates in Order 888, the nondiscriminatory curtailment requirement is designed to facilitate the overarching goal of competitive prices for wholesale electricity. This goal would be frustrated by the discriminatory access to transmission service mandated by KRS 278.214. *See id.* Because KRS 278.214 conflicts with FERC's exclusive authority to remedy discrimination in wholesale electricity rates as set forth in Order 888, it is preempted under the filed rate doctrine.

**D. The Eighth Circuit's decision in *Northern States Power* does not undermine federal preemption of KRS 278.214 and the PSC Order.**

In its Order requiring LG&E and KU to file tariffs conforming to KRS 278.214, the PSC relied on the Eighth Circuit's decision in *Northern States Power*[35] in finding that FERC lacked the authority to regulate curtailment of transmissions in Kentucky. [PSC Order, **Exhibit 4**] *Northern States Power* involved an appeal of a FERC Order requiring a public utility to file a tariff that would comply with the nondiscriminatory curtailment requirements of Order 888. The Eighth Circuit framed the legal issue as follows: "whether FERC may, through its tariff orders, require NSP, a state public utility, to curtail electrical transmission to wholesale (point-to-point) customers on a comparable basis with its native/retail customers when it experiences power constraints." 176 F.3d at 1093. The Eighth Circuit held, based on the "savings clause" in the FPA, that "FERC's attempt to regulate the curtailment of electrical transmission on native/retail customers [was] unlawful, as it falls outside of the FPA's specific grant of authority to FERC." *Id.* at 1096.

It is manifestly apparent that *Northern States Power* has been impliedly overruled by *New York v. FERC*, 535 U.S. 1 (1992).[36] In *New York v. FERC*, the Supreme Court made clear that FERC has jurisdiction over all transmissions of electricity in interstate commerce, which includes any transmission onto the national power grid. *Id.* at 8 fn. 5,

---

[35] 176 F.3d 1090 (8th Cir. 1999), *cert. denied*, 528 U.S. 1182 (2000). In the Attorney General's reply brief on the abstention issue, *Northern States Power* is cited for the proposition that "FERC has no authority to regulate in the area of service adequacy for native load." Reply of the Attorney General in support of motion to abstain, p. 2.

[36] The holding and reasoning of *New York v. FERC* are discussed in great depth, *supra*, at Section II.A.1.

16. Accordingly, the Supreme Court held that FERC had the authority to regulate the transmission component of an in-state retail sale. *Id.* at 23-24. This is because, "as the Supreme Court has recently explained, FERC's jurisdiction over electricity transmission, unlike its jurisdiction over sales (i.e. rates) can reach *intrastate* transmissions." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 931 fn. 9 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2272 (2003) *citing New York v. FERC*, 535 U.S. 1 (2002).

After *New York v. FERC*, the conclusion in *Northern States Power* that FERC lacks the authority to regulate curtailment of the transmission component of a retail sale is simply incorrect. The Federal Power Act gives FERC exclusive jurisdiction to regulate all transmissions in interstate commerce. *Pub. Utils. Comm'n of the State of Cal. v. Fed. Energy Reg. Comm'n*, 900 F.2d 269, 274 (D.C. Cir. 1990). Residual state regulation over retail rates cannot affect this jurisdictional grant. This is because "[e]ven where state regulation operates within its own field, it may not intrude 'indirectly' on areas on exclusive federal jurisdiction." *Id.* at fn. 2.

Thus, *Northern States Power* reached a conclusion opposite to the subsequent holding of the Supreme Court in *New York v. FERC*. It is the states who may not exercise their authority over retail electricity rates in a manner that encroaches on exclusive federal jurisdiction over transmissions in interstate commerce – not vice versa. Because the reasoning in *Northern States Power* is patently inconsistent with the

Supreme Court's reasoning in *New York v. FERC*, it should be given no persuasive authority in the Sixth Circuit.[37]

## CONCLUSION

Plaintiffs Louisville Gas and Electric Company and Kentucky Utilities Company have filed a motion for summary judgment on their claims that KRS 278.214 and a PSC order under the statute violate the Commerce Clause and are preempted by supreme federal law. Because there are no issues of material fact with respect to these constitutional claims, the Plaintiffs are entitled to judgment as a matter of law.

---

[37] However, *Northern States Power* helps illustrate why the filed rate doctrine prevents the PSC from collaterally attacking FERC Order 888 in this action. *Northern States Power* was a direct statutory appeal of a FERC order to the Circuit Court of Appeals. By contrast, KRS 278.214, which precipitated this action, is a collateral attack on Order 888.

Respectfully submitted,

Sheryl G. Snyder
David S. Kaplan
FROST BROWN TODD LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202-3363
(502) 589-5400 – phone
(502) 589-1087 – facsimile

***Attorneys for Plaintiffs, Louisville Gas
and Electric and Kentucky Utilities
Company***

OF COUNSEL:
Dorothy E. O'Brien
Deputy General Counsel
LG&E Energy Corp.
220 West Main St., 11th Floor
Louisville, Kentucky 40202
(502) 627-3450

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the Memorandum in Support of Motion for Summary Judgment was this 7th day of November, 2003, served by U.S. Mail, first class mail, postage prepaid, upon:

Dennis G. Howard, II
Elizabeth E. Blackford
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601-8204

Mark R. Overstreet
Stites & Harbison
421 W. Main St.
P.O. Box 634
Frankfort, KY 40602-0634

Richard G. Raff
Deborah T. Eversole
Kentucky Public Service Commission
211 Sower Boulevard, P.O. Box 615
Frankfort, KY 40602-0615

David F. Boehm
Kurt J. Boehm
Boehm, Kurtz & Lowry
36 E. Seventh St., Suite 2110
Cincinnati, OH 45202

*Counsel for Plaintiffs, Louisville Gas and Electric and Kentucky Utilities Company*

LOULibrary/299313.2