Eastern District of Kentucky
FILED

OCT 2 2 2004

AT FRANKFORT
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. 03-47-JMH

KENTUCKY POWER COMPANY D/B/A
AMERICAN ELECTRIC POWER                                    PLAINTIFF

v.

MARTIN J. HUELSMANN, *et al.*                              DEFENDANTS

- and -

LOUISVILLE GAS AND ELECTRIC COMPANY and
KENTUCKY UTILITIES COMPANY                                 PLAINTIFFS

v.

MARTIN J. HUELSMANN, *et al.*                              DEFENDANTS

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND COMBINED RESPONSE TO DEFENDANTS' CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

*May it please the Court:*

Plaintiffs Louisville Gas and Electric Company and Kentucky Utilities Company (the

"Plaintiffs"), for their Reply in support of their motion for summary judgment and Combined

Response to Defendants' cross-motions for summary judgment, state as follows:

**INTRODUCTION**

KRS 278.214 blatantly violates the Dormant Commerce Clause of the United States

Constitution. The Kentucky statute requires that in the event of a transmission system

emergency, utilities must curtail service to their out-of-state retail and wholesale customers in

order to ensure adequate service to similarly situated Kentucky wholesale and retail customers.

Contrary to the Defendants' characterization of the statute, KRS 278.214 does much more than

distinguish between retail and wholesale customers. It commands, for example, that "captive" retail customers in Kentucky be given preference over a utility's similarly "captive" retail customers located in other states. Controlling U.S. Supreme Court precedent makes clear that this discrimination against similarly situated out-of-state economic interests is facially unconstitutional under the Commerce Clause.

KRS 278.214 is also preempted by federal law. Under the Federal Power Act, FERC is given exclusive jurisdiction over interstate transmissions of electric energy. KRS 278.214 directly regulates interstate transmissions, and therefore intrudes into an arena Congress reserved exclusively for regulation by FERC. KRS 278.214 is also directly in conflict with FERC's specific directive in Order 888 that all curtailments of interstate transmissions occur on a non-discriminatory basis. The Plaintiffs cannot comply with both FERC Order No. 888 and KRS 278.214 with respect to the curtailment priority afforded to in-state and out-of-state customers.

The PSC concedes the existence of a conflict between Order No. 888 and the Kentucky statute, but maintains that FERC lacks the statutory authority to enforce nondiscriminatory curtailment with respect to transmissions connected to a retail sale. However, as this Court has already recognized, both the filed rate doctrine and the judicial review provisions of the Federal Power Act foreclose the PSC's collateral attack on the underlying validity of Order No. 888. Even if this Court could entertain a collateral challenge to FERC's orders, the Federal Power Act clearly empowers FERC to order non-discriminatory curtailments of all transmissions, whether connected to a wholesale or retail sale.

MISO's contention that there is no actual conflict between KRS 278.214 and FERC Order 888, or the corresponding provisions of the MISO tariff, also misses the mark. MISO's creative interpretations of the relevant state and federal mandates cannot obscure the facial

inconsistency between these provisions, or the fact that the PSC itself – the agency charged with enforcing KRS 278.214 – has expressly determined that Plaintiffs cannot comply with both provisions. Thus, the Kentucky statute is preempted.

# STATEMENT OF POINTS AND AUTHORITIES

INTRODUCTION ................................................................................................ i

STATEMENT OF POINTS AND AUTHORITIES .................................. iv

ARGUMENT ..................................................................................................... 1

I.    **KRS 278.214 discriminates against interstate commerce** .............. 1

    *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) .............. 1, 9

    KRS 278.214 ......................................................................................... 1-7, 9

    KRS 278.017 ............................................................................................. 1, 3

    KRS 278.010(5) ............................................................................................ 1

    KRS 278.016 ............................................................................................. 1, 3

    KRS 278.020 .................................................................................................. 1

    *Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972) .......... 2, 9

    *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ......................... 2, 8, 9

    *Public Serv. Comm'n of Kentucky v. FERC*, 610 F.2d 439 (6th Cir. 1979) ......... 2

    *National Revenue Corporation v. Violet*, 807 F.2d 285 (1st Cir. 1986) .............. 3

    *Exxon Corp. v. Maryland*, 437 U.S. 117 (1978) ........................................ 4

    *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ............................. 5, 6, 7

    *Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ...................................... 7

    *Oregon Waste Sys., Inc. v. Dept. of Envtl. Quality*, 511 U.S. 93 (1994) .......... 7

    *Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .......................................... 8

    *Alliant Energy Corp. v. Bie*, 330 F.3d 904 (7th Cir. 2003) ...................... 8

    *Southern Union Co. v. Missouri Public Serv. Comm'n*, 289 F.3d 503 (8th Cir. 2002) ......... 8

    *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408 (4th Cir. 1985) .............. 8

*Indianapolis Power & Light Co. v. Pennsylvania Public Util. Comm'n*, 711 A.2d 1071 (Penn. Commw. Ct. 1998) ................................................................. 8

**II.   KRS 278.214 is preempted by federal law** ...................................................... 9

KRS 278.214 ........................................................................................................ 9

*New York v. FERC*, 535 U.S. 1 (2002) ............................................................... 9

*Panhandle Eastern Pipeline Co. v. Public Serv. Comm'n*, 332 U.S. 507 (1947) ....... 9

**A.   KRS 278.214 invades FERC's exclusive authority to regulate transmissions of electricity in interstate commerce** .......................... 10

*Duke Energy Trading & Marketing L.L.C. v. Davis,* 267 F.3d 1042 (9th Cir. 2001) ......................................................................................... 10

*Public Utils. Comm'n of California v. FERC*, 900 F.2d 269 (D.C. Cir. 1990) ............................................................................................ 10, 12

*In re California Wholesale Elec. Antitrust Litig.*, 244 F. Supp. 2d 1072 (S.D. Cal. 2003) ....................................................................................... 10

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) ................................... 10

16 U.S.C. § 824(b)(1) .................................................................................... 10, 11

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) ....................... 10

*Transmission Agency of N. California v. Sierra Pacific Power Co.*, 295 F.3d 918 (9th Cir. 2002) ................................................................... 11

KRS 278.214 ....................................................................................... 11, 15, 16

*New York v. FERC*, 535 U.S. 1 (2002) ............................................................. 11

William Penniman & Paul Turner, *A jurisdictional Clash Over Electricity Transmission: Northern States Power v. FERC*, 20 ENERGY L.J. 205 (1999) .................................................................................... 13, 15

*Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972) ........................................................................................... 13, 14

15 U.S.C. § 717(b) ............................................................................................. 13

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) .............................. 13

*Panhandle Eastern Pipeline Co. v. Public Serv. Comm'n*, 332 U.S. 507 (1947) ...................................................................................................... 13

*United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996) ...................... 14

**B. KRS 278.214 is preempted because it directly conflicts with FERC Order 888 and the MISO OATT** ........................................................ 16

KRS 278.214 ................................................................................ 16

**1.** ***Northern States Power* does not immunize KRS 278.214 from preemption** ..................................................................... 16

William Penniman & Paul Turner, *A jurisdictional Clash Over Electricity Transmission: Northern States Power v. FERC*, 20 ENERGY L.J. 205 (1999) ......................................... 16, 17, 18, 20, 21

*New York v. FERC*, 535 U.S. 1, 17 (2002) ................................. 17

*Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972) .............................................................................. 17

KRS 278.214 ....................................................................... 18, 21

*In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072 (S.D. Cal. 2003) ............................................................................... 18

*Pac. Gas & Elec. Co. v. Lynch*, 216 F. Supp.2d 1016 (N.D. Cal. 2002)... 18

*Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246 (1951) .............................................................................. 18

16 U.S.C. § 824 ..................................................................... 18

16 U.S.C. 825l(b) ............................................................ 18, 19, 20

*Kentucky Util. Co. v. FERC*, 789 F.2d 1210 (6th Cir. 1986) ............... 19, 20

*United States v. Southern Cal. Edison Co.*, 300 F. Supp. 2d 964 (E.D. Cal. 2004) .............................................................................. 19

*Rivers Elec. Co. v. 4.6 Acres of Land*, 731 F. Supp. 83 (N.D.N.Y. 1990) 19

*Mega Renewables v. County of Shasta*, 644 F. Supp. 491 (E.D. Cal. 1986) ............................................................................................. 19

**2. KRS 278.214's requirement that Kentucky retail customers be the last to be curtailed is in conflict with the non-discriminatory curtailment requirement of the Order 888 Pro Forma Tariff and the MISO OATT** ....................................... 22

KRS 278.214 ............................................................... 22-25

      **3.**     **KRS 278.214 stands as an obstacle to Congress' policy of creating a competitive national market in power generation** ..............26

             KRS 278.214 .................................................................................26, 28

             *Schneidwind v. ANR Pipeline Co.,* 485 U.S. 293 (1988) ...........................26

             *New York v. FERC*, 535 U.S. 1 (2002) ...............................................26, 27

**CONCLUSION** .........................................................................................................29

**ARGUMENT**

**I.     KRS 278.214 discriminates against interstate commerce.**

The Commerce Clause "precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982). That is precisely what KRS 278.214 does. It requires the Plaintiffs, in the event of a transmission system emergency, to curtail service to Kentucky retail customers within their certified territories (and to Kentucky distribution cooperatives serving Kentucky retail customers) only after curtailing service to all other customers – **including LG&E and KU's similarly situated retail and wholesale customers residing outside Kentucky**.

It is undisputed that all customers within the certified territories of LG&E and KU are Kentucky residents.[1]     [Affidavit of Michael S. Beer, ¶ 3.] It is also undisputed that no out-of-state customers can benefit from the curtailment priority set forth it KRS 278.214. The statutory protection is reserved entirely for in-state customers, and the correlative burden falls entirely upon out-of-staters. As a result of the discriminatory curtailment procedure in KRS 278.214, retail and wholesale customers in other states will have their service curtailed during transmission system emergencies while similarly-situated customers in Kentucky will be unaffected. The Commerce Clause simply does not permit this result.

In the analogous arena of natural gas regulation, the Supreme Court has expressly declared that state law curtailment preferences for in-state customers violate the Commerce

---

[1] "Certified territory" is defined in the statute as "the area certified by and pursuant to KRS 278.017." *See* KRS 278.010(5). KRS 278.016 provides that **"the state** be divided into geographical areas, establishing the areas within which each retail electric supplier is to provide the retail electric service as provided in KRS 278.016 to 278.020." Thus, the statutes necessarily limit "certified territories" to geographic subdivisions of the state. Obviously, the Kentucky PSC has no jurisdiction to establish certified territories outside the state.

Clause. *See Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 634 (1972); *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). *See also Public Serv. Comm'n of Kentucky v. FERC*, 610 F.2d 439, 444 (6th Cir. 1979) ("The states thus may not, without federal authorization, divert from the interstate market supplies of natural gas for the use of state residents only."). For example, in *Louisiana Power & Light, supra*, the Court noted that state regulation of natural gas curtailments in times of supply shortages would violate the Commerce Clause to the extent that they give in-state customers a preferred right of access over out-of-state customers. As the Court explained:

> [I]nsofar as state plans purport to curtail deliveries of interstate gas, . . . such plans, when they operate to withdraw a large volume of gas from an established interstate current whereby it is supplied to customers in other States, would constitute a prohibited interference with interstate commerce.

*Id. citing Pennsylvania v. West Virginia*, 262 U.S. 553.

In *Pennsylvania v. West Virginia, supra*, the Supreme Court invalidated a West Virginia law that required natural gas pipeline companies to curtail out-of-state deliveries of natural gas during supply shortfalls to ensure that in-state customers' needs were met. The Court explained that states cannot regulate interstate business to give an advantage to local consumers:

> The supply of gas necessarily marks the extent of the service that can be rendered. Much of the business is interstate and has grown up through a course of years. . . . [West Virginia's] present effort, rightly understood, is to subordinate that part to the local business within her borders. In other words, **it is in effect an attempt to regulate the interstate business to the advantage of the local consumers. But this she may not do.** A direction to one of her railroads when short of facilities for moving coal to haul intrastate coal to the exclusion of interstate coal would not be different in kind or force.

*Id.* at 597-98 (emphasis added).

The PSC and MISO do not, and cannot, distinguish these precedents. Instead, they make the untenable claim that KRS 278.214 does not discriminate between in-state and out-of-state customers. First, they argue that KRS 278.214 does not facially discriminate against out-of-state

interests, because it does not expressly classify customers according to state residence; and second, they argue that wholesale and retail customers are not similarly situated and, therefore, need not be curtailed in an even-handed fashion. Neither of these contentions passes muster under Commerce Clause precedents.

Initially, the argument that KRS 278.214 does not explicitly distinguish between in-state and out-of-state customers puts form over substance. [PSC Mem., p. ii[2]; MISO Mem., p. 21.] Although KRS 278.214 does not use the phrase "Kentucky customers" to describe the class of customers favored by the statute, it is undisputed that only Kentucky customers can benefit from the curtailment priority set forth in KRS 278.214. [Beer Aff., ¶ 3.] *See also* KRS 278.216-.217. That undeniable fact has been trumpeted by the PSC itself, which has stated unequivocally that "KRS 278.214 simply protects Kentucky ratepayers' interest in transmission facilities which were built to serve their needs . . . ." [PSC Order, at 5, **Exhibit 4** to Pl. Mem.]

A discriminatory state statute cannot escape Commerce Clause scrutiny merely by avoiding explicit reference to in-state interests. For example, in *National Revenue Corporation v. Violet*, the First Circuit struck down a Rhode Island statute that limited the provision of debt collection services to Rhode Island residents. 807 F.2d 285, 286-87 (1st Cir. 1986) . The statute accomplished this result by defining debt collection as the practice of law, which automatically excluded any person who was not a member of the Rhode Island bar. *Id.* The Court explained:

> By defining all debt collection as the practice of law, and limiting this practice to members of the Rhode Island bar, Rhode Island effectively bars out-of-staters from offering a commercial service within its borders and confers the right to provide that service – and to reap the associated economic benefit – upon a class largely composed of Rhode Island citizens.

---

[2] *See also* p. 4, "[KRS 278.214] does not distinguish between in-state and out-of-state sales . . . ."; p. 23 ("[KRS 278.214] draws no distinction between interstate and intrastate commerce.").

*Id.* at 290. The Court therefore held that the statute discriminated both "on its face [and] in practical effect." *Id.* at 289 (citations omitted).

Likewise, KRS 278.214 requires that the Plaintiffs curtail service to customers outside their certified territories before curtailing service to retail customers within their certified territories. These certified territories are located entirely within Kentucky pursuant to statute. [Beer Aff., ¶ 3.] Therefore, it is clear that the statute both facially and in practical effect provides protections to Kentucky residents that are denied to out-of-staters.[3]

The PSC's and MISO's argument that captive retail customers are not similarly situated to non-captive wholesale customers, and therefore may be treated differently, also misses the mark. [PSC Mem., pp. 15-18; MISO Mem., p. 20.] This argument fails because KRS 278.214 does not in fact sharply distinguish between captive retail and wholesale customers. The favored class under KRS 278.214 actually includes: (1) retail customers inside the utility's Kentucky certified territory; and (2) Kentucky member distribution cooperatives purchasing power at wholesale to serve their own retail customers. The disfavored class of "all other customers" under KRS 278.214 encompasses **all** out-of-state customers, **including a utility's out-of-state captive retail customers and out-of-state wholesale customers purchasing power to serve their own retail customers.** These out-of-state customers are similarly situated in all respects

---

[3] MISO's reliance on *Exxon Corp. v. Maryland*, 437 U.S. 117 (1978), is therefore misplaced. [MISO Mem., p. 22.] The statute in *Exxon* merely prevented an oil refiner from operating a retail gas station in Maryland. Although no oil refiners were located in Maryland, the Court correctly observed that the statute did not facially discriminate on the basis of geographic origin because the void left by the departure of oil refiner station operators could just as easily be filled by out-of-state independent gasoline dealers as by in-state independent dealers. The Court emphasized, "the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods ..., or distinguish between in-state and out-of-state companies in the retail market." *Id.* at 126. The same cannot be said of KRS 278.214, which creates a curtailment preference that by statute can never extend to out-of-state customers.

to the Kentucky customers favored by KRS 278.214, except that they are located outside Kentucky. Thus, KRS 278.214 facially discriminates on the basis of geographic origin.

Plaintiffs LG&E and KU, like Plaintiff AEP, have captive retail customers both inside and outside of Kentucky. [Beer Supp. Aff., ¶ 4, attached as **Exhibit A**; C. Baker Aff. ¶ 4.] LG&E and KU serve approximately 29,000 retail customers in Virginia who, like their Kentucky retail customers, cannot purchase electricity from other sellers. [Beer Supp. Aff., ¶ 4.] LG&E and KU also serve a small number of captive retail customers in Tennessee. [*Id.*] Under KRS 278.214, LG&E and KU must curtail service to these out-of-state customers before curtailing service to Kentucky retail customers in their certified territories, solely because the latter class of captive retail customers are Kentuckians.

Additionally, some of the Plaintiffs' interstate wholesale customers are utilities that purchase power to serve their own captive retail markets. [Beer Aff., ¶ 7.] These customers are similarly situated to the member distribution cooperative wholesale customers favored by KRS 278.214, except of course that their retail customers are not located within a "certified territory" in Kentucky.[4]

Because KRS 278.214 discriminates between similarly situated in-state and out-of-state customers, *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) is inapposite. In *Tracy*, General Motors Corp. ("GMC"), a large industrial customer of an independent natural gas marketer, challenged an Ohio law that taxed sales by the independent marketer but exempted from taxation all natural gas sales by Ohio monopoly utilities. GMC alleged that the differential tax treatment of out-of-state gas suppliers constituted facial discrimination, and was *per se* invalid under the

---

[4] The PSC inexplicably denies the existence of any discrimination among wholesale customers. [PSC Resp., p. 2 ("The General Assembly provided no priority for wholesale Kentucky customers over wholesale out-of-state customers.").] But that representation simply cannot be squared with the plain language of KRS 278.214.

Commerce Clause. The Court held that the statute did not facially discriminate because independent marketers and monopoly utilities were not similarly situated. The Court observed that the in-state monopolies primarily served a market consisting of captive residential customers who required the stability of regulated retail service. *Id.* at 301-02. By contrast, the out-of-state marketers were serving large industrial end-users in a competitive market, and were not in a position to provide service to the captive retail market. *Id.* at 302-03. Thus, there were legitimate reasons, aside from mere geographic origin, that supported the differential treatment – i.e., the state's interest in preserving the stability of the monopoly utilities necessary to serve the needs of the residential market. Moreover, since independent marketers could never realistically compete to provide service in the residential market, the Commerce Clause's goal of promoting interstate competition was not implicated.[5]

Unlike the situation in *Tracy*, KRS 278.214 disadvantages out-of-state captive retail and wholesale customers of regulated utilities who **are** similarly situated to the Kentucky retail and wholesale customers protected by the statute. These out-of-state customers are just as vulnerable in the event of a service curtailment as Kentucky retail customers would be. *Tracy* did not hold that a state's interest in protecting its own retail customers will allow it to discriminate against out-of-staters who are similarly situated to preferred in-state customers. To the contrary, the Court expressly stated that "if a State discriminates against out-of-state interests by drawing geographical distinctions between entities that are otherwise similarly situated, such facial

---

[5] The Court observed that monopoly utilities did compete against independent marketers in the competitive wholesale market. Nonetheless, the Court held that "controlling significance" should be given to the captive market, because any attempt to level the playing field in the competitive market could threaten utilities' ability to provide service to the captive market. *Id.* at 309. Thus, the fact that there was some competition was not sufficient to make independent marketers and monopoly utilities similarly situated.

discrimination will be subject to a high level of judicial scrutiny even if it is directed toward a legitimate health and safety goal." *Tracy*, 519 U.S. at 307 n.15.[6]

Contrary to MISO's assertions, moreover, the fact that some Kentucky customers, such as municipalities, are not within the favored class under KRS 278.214 does not change the constitutional analysis. [MISO Mem., p. 16.] KRS 278.214 violates the Commerce Clause because it provides a curtailment preference **only** to Kentucky customers, and disadvantages similarly-situated customers located outside Kentucky. The fact that not all classes of Kentucky customers receive the same discriminatory preference does not save the statute.

The Supreme Court has erected a "virtually *per se* rule of invalidity" against legislation that facially discriminates against out-of-state commerce. *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). Because KRS 278.214 facially discriminates against out-of-state retail and wholesale customers, it is presumptively unconstitutional and the Court need not inquire whether the benefits of the statute outweigh its burdens on interstate commerce. *Id.* In such situations, the burden of justifying the statute is on the State and "the State's burden of justification is so heavy that facial discrimination by itself may be a fatal defect." *Oregon Waste Sys., Inc. v. Dept. of Envtl. Quality*, 511 U.S. 93, 98 (1994).

Thus, MISO's argument that LG&E and KU have failed to present evidence proving the extent of KRS 278.214's burden on interstate commerce applies the wrong legal standard to a case of facial discrimination. [MISO Mem., p. 23.] "[W]here discrimination is patent, as it is

---

[6] Notably, the *Tracy* Court apparently acknowledged that the Ohio statute would violate the Commerce Clause if it denied a tax exemption to out-of-state monopoly utilities that also served captive retail customers, who would be similarly situated to Ohio monopoly utilities. *Id.* at 310. The Court merely deferred the question because "the Ohio courts might well extend the challenged exemption to out-of-state utilities if confronted with the question." *Id.*

here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *Wyoming v. Oklahoma*, 502 U.S. 437, 456 (1992).

For the same reason, the PSC's reliance on a litany of cases recognizing that "legitimate local interests" in ensuring adequate retail service can justify "incidental burdens on interstate commerce" is misplaced. [PSC Mem., pp. 19-22.] In all of these cases, the courts undertook to balance local benefits against the burdens on interstate commerce only **after** determining that the state statute did not facially discriminate against out-of-state economic interests.[7]

In any event, the Supreme Court's decision in *Pennsylvania v. West Virginia, supra*, makes clear that a state's interest in ensuring adequate utility service will not justify giving its own citizens a curtailment preference that compromises the ability of other states to ensure adequate service to their citizens. 262 U.S. at 597. In invalidating the West Virginia law requiring satisfaction of in-state demand for natural gas before out-of-state sales could be made, the Supreme Court explicitly rejected the argument that the state's special interest in ensuring adequate utility service justified differential treatment. The Court explained:

> It is true that the business is of a quasi-public character, but it is so in Pennsylvania and Ohio as well as in West Virginia. The obligations inhering in it and the power to insist on an adequate service are the same in all three States.

*Id.* In other words, a state cannot grant a discriminatory preference to its own interest in ensuring adequate utility service over other states' equivalent interests.

---

[7] *See Alliant Energy Corp. v. Bie*, 330 F.3d 904, 916 (7th Cir. 2003) (applying balancing test after finding that "[n]one of these provisions discriminates on its face against out-of-state economic interests"); *Southern Union Co. v. Missouri Public Serv. Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002) (applying balancing test to change-of-control regulation after finding that "Commission approval is required for purchases of stock issued by Missouri utilities as well as by out-of-state utilities"); *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1422 (4th Cir. 1985) ("We find that section 24(e) regulates evenhandedly and is thus subject to the *Pike* balancing approach."); *Indianapolis Power & Light Co. v. Pennsylvania Public Util. Comm'n*, 711 A.2d 1071, 1079 (Penn. Commw. Ct. 1998) ("[T]he stranded cost provisions . . . do not discriminate against interstate commerce.").

Ultimately, KRS 278.214 is exactly the kind of "simple economic protectionism" that the Commerce Clause prohibits. *New England Power Co.*, 455 U.S. at 339. The statute seeks to insulate certain Kentucky customers from the effects of a transmission system emergency, by requiring utilities to curtail service to out-of-state retail and wholesale customers in order to preserve service to similarly situated Kentucky customers. Controlling Supreme Court precedent establishes that such a facially discriminatory curtailment policy is unconstitutional. *Id.*; *Louisiana Power & Light Co.*, 406 U.S. at 634; *Pennsylvania v. West Virginia*, 262 U.S. 553.

**II.     KRS 278.214 is preempted by federal law.**

KRS 278.214 regulates what steps a transmission-system owning utility may take to alleviate a constraint on its transmission system. The statute therefore intrudes on a field of regulation that Congress has expressly reserved to FERC in the Federal Power Act. This conclusion is compelled by the Supreme Court's recent decision in *New York v. FERC*, as well as long-standing Supreme Court precedents interpreting the analogous jurisdictional provisions of the Natural Gas Act, which hold that regulation of service curtailments is a matter of unique federal competence and beyond the jurisdiction of the states.[8]     Moreover, KRS 278.214 establishes a system of curtailment priorities that is in direct conflict with those established in FERC Order 888 and MISO's federal tariff. The state statute is therefore preempted by federal law irrespective of whether state regulation of interstate transmissions has been expressly preempted by the Federal Power Act or whether Congress has effectively occupied this field.

---

[8] *See Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972); *Panhandle Eastern Pipeline Co. v. Public Serv. Comm'n*, 332 U.S. 507 (1947).

**A.** **KRS 278.214 invades FERC's exclusive authority to regulate transmissions of electricity in interstate commerce.**

"[I]t is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *Duke Energy Trading & Marketing L.L.C. v. Davis*, 267 F.3d 1042, 1058 (9th Cir. 2001), *quoting Miss. Power & Light Co. v. Mississippi*, 487 U.S. 354, 377 (1988) (Scalia, J., concurring). *See also Public Utils. Comm'n of California v. FERC*, 900 F.2d 269, 274 (D.C. Cir. 1990) ("Cases are legion affirming the exclusive character of FERC jurisdiction where it applies . . . ."). Thus, "[t]o the extent state regulation would operate 'within this exclusively federal domain,' it is preempted." *Public Utils. Comm'n of California*, 900 F.2d at 274 (quotation omitted). *See also In re California Wholesale Elec. Antitrust Litig.*, 244 F. Supp. 2d 1072, 1082 (S.D. Cal. 2003) (holding state law claims barred under doctrine of field preemption because "FERC maintains exclusive jurisdiction over interstate wholesale electricity rates"). *Cf. Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01, 305 (1988) (holding that Natural Gas Act "confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale" and accordingly "occupies the field" of matters relating to those areas).

It is beyond cavil that FERC's exclusive jurisdiction under the Federal Power Act encompasses interstate transmissions of electric energy. *See* 16 U.S.C. § 824(b)(1). *See also New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (Federal Power Act "delegated to [FERC] **exclusive authority** to regulate the **transmission** and sale at wholesale of electric energy in interstate commerce")(emphasis added). Consequently, "any right to a particular allocation of interstate transmission capacity must now be considered an exclusive matter of federal law." *Transmission Agency of N. California v. Sierra Pacific Power Co.*, 295

F.3d 918, 931 (9th Cir. 2002). Because KRS 278.214 directly regulates interstate transmissions of electric energy, it intrudes on a field reserved exclusively to federal regulation.

MISO's assertion that "Plaintiffs do not cite anything suggesting that the federal government has occupied the field regarding the transmission component of bundled retail service" ignores the jurisdictional grant of the Federal Power Act itself. [MISO Mem., p. 31.] The FPA clearly gives FERC exclusive authority over **all** interstate transmissions; it does not distinguish between transmissions underlying wholesale sales and those embedded in bundled retail sales. *See* 16 U.S.C. § 824(b)(1). The wholesale/retail distinction applies only to FERC's *rate-setting* authority. *New York v. FERC*, 535 U.S. 1, 17 (2002).

The scope of FERC's "transmission" authority was recently clarified in *New York v. FERC*, 535 U.S. 1, which upheld FERC's authority to issue Order 888. In that case, a number of states argued that FERC lacked the authority to regulate transmissions connected to a retail sale due to the states' exclusive jurisdiction over retail sales. *Id.* at 16. The Court flatly rejected the states' argument based on its factual finding that **all transmissions** onto the national power grid are transmissions in interstate commerce. *Id.* at 16. Accordingly, the Court upheld FERC's authority to regulate transmissions connected to a retail sale. *Id.* at 20 ("Because the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer, FERC's exercise of this power is valid."). *See also id.* at 17 ("There is no language in the statute limiting FERC's *transmission* jurisdiction to the wholesale market . . . .").

MISO's and the PSC's contention that Order 888 did not actually exercise FERC's authority with respect to the curtailment of bundled retail transmissions is both legally incorrect and largely beside the point. FERC jurisdiction is exclusive where it applies. *Public Utils.*

*Comm'n of California,* 900 F.2d at 274. Thus, if FERC possesses jurisdiction over bundled retail transmissions under the Federal Power Act, the states do not.

In any event, FERC clearly has exercised its authority to order non-discriminatory curtailment of bundled retail transmissions. The plain language of the Order 888 Pro Forma Tariff applies to all transmissions. It does not exempt bundled retail transmissions. To the contrary, both the Pro Forma Tariff and the MISO OATT expressly decree that curtailment of point-to-point transmission service must be comparable to curtailments of the transmission owner's native load customers, which includes bundled retail sales. *See* Order 888 Pro Forma Tariff, ¶ 13.6 (Curtailment of Firm Transmission Service), and ¶ 1.19 (Definition of Native Load Customer); MISO OATT ¶¶ 13.6 and 1.19.

Indeed, in Order No. 888-A, FERC considered and specifically **rejected** the argument that "transactions subject to proportional curtailment should not include a transmitting utility's own use of its system to transmit its owned and purchased generation to native load customers as part of **bundled retail** service . . . ." Order No. 888-A, 62 Fed. Reg. ¶ 12, 274, at 12, 356 (March 14, 1997) (emphasis added).

To support their contention that FERC did not intend to regulate bundled retail transmissions, the PSC and MISO rely on general statements scattered throughout the voluminous Order No. 888, which do not specifically relate to curtailments. However, the plain language of Paragraph 13.6 of the Pro Forma Tariff and the FERC commentary on that specific provision shows that FERC has in fact exercised its authority to order proportional curtailments for all transmissions in interstate commerce, whether they are connected to a bundled retail, unbundled retail, or wholesale sale.

Accordingly, as one commentator observed, "Order 888A's pronouncement about the FERC's lacking jurisdiction over the transmission embedded in bundled retail sales should be

understood merely to refer to its lack of **rate jurisdiction** over such services." William Penniman & Paul Turner, *A jurisdictional Clash Over Electricity Transmission: Northern States Power v. FERC*, 20 ENERGY L.J. 205, 220 (1999) (emphasis added). As FERC explained during the Commission proceedings in the *Northern States Power* case, Order 888 "does not regulate bundled retail **sales**, but the pro forma open access tariff . . . does require that wholesale transmission users be treated comparably to the transmission provider's native load customers, **including retail customers**." 84 F.E.R.C. ¶ 61,128, at 61,671 (July 31, 1998) (emphasis added).

Moreover, Supreme Court decisions interpreting the analogous jurisdictional provisions of the Natural Gas Act ("NGA") compel the conclusion that regulation of service curtailments falls within FERC's exclusive jurisdiction over interstate transmissions. *See, e.g., Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972). The jurisdictional scheme of the NGA mirrors the Federal Power Act's distribution of authority: FERC is given exclusive jurisdiction over all interstate "transportation" of natural gas, as well as interstate wholesale sales, while a "savings clause" retains state jurisdiction over intrastate retail sales of natural gas. *See* 15 U.S.C. § 717(b). Accordingly, provisions of the Federal Power Act should be interpreted *in pari materia* with the analogous provisions of the NGA, and precedents interpreting one statute are presumptively applicable to the other. *E.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 n.7 (1981).

The Supreme Court has long held that FERC's authority to regulate interstate "transportation" of natural gas under the NGA includes the authority to regulate orderly curtailment plans for both retail and wholesale sales. *See Louisiana Power & Light Co.*, 406 U.S. 621; *Panhandle Eastern Pipeline Co. v. Public Serv. Comm'n*, 332 U.S. 507 (1947) ("[T]he matter of interrupting service is one largely related . . . to transportation and thus within the jurisdiction of the Federal Power Commission."). *See also United Distribution Cos. v. FERC*, 88

F.3d 1105, 1142-47 (D.C. Cir. 1996) (upholding FERC regulation of supply and transmission capacity curtailments under FERC Order 636, which ordered open access to natural gas transportation systems).

In *Louisiana Power & Light Co.*, for example, the Federal Power Commission ("FPC") – the predecessor to FERC – approved a pipeline owner's curtailment plan that prioritized curtailments of natural gas deliveries according to the intended end use of the gas, without distinguishing between retail and wholesale sales. 406 U.S. 621. A retail purchaser challenged the plan, arguing that the NGA's reservation of state jurisdiction over retail sales of natural gas denied the FPC authority to regulate curtailment of such sales. The Supreme Court concluded that the savings clause "withheld from FPC only *rate-setting* authority with respect to direct sales. **Curtailment regulations are not *rate-setting* regulations but regulations for the 'transportation' of natural gas and thus within FPC jurisdiction.**" *Id.* at 638 (emphasis in original) (emphasis added).

In reaching this conclusion, the Court observed that "**[c]omprehensive and equitable curtailment plans for gas transported in interstate commerce . . . are practically beyond the competence of state regulatory agencies.**" *Id.* at 641 (emphasis added). Permitting states to regulate curtailment priorities, the Court explained, would lead to inconsistent state obligations as each state would attempt to promote its own interests over those of other states. The result would be a chaotic and incoherent curtailment policy:

> [E]ven to the extent the States may constitutionally promulgate curtailment plans, the inevitable result would be varied regulatory programs of state courts and agencies, interpreting a countless number of different contracts and applying a variety of state agency rules. The conflicting results would necessarily produce allocations determined simply by the ability of each customer to pump its desired volume from a pipeline. . . . [A] state agency empowered to regulate these contracts would be obliged to regulate in the State, not the national interest. The unavoidable conflict between producing states and consuming States will create contradictory regulations that cannot possibly be equitably resolved by the courts.

> With these problems in mind, **the desirability of uniform federal regulation is abundantly clear.**

*Id.* 634-35 (emphasis added).

The same reasoning holds true here. Just as curtailments of both retail and wholesale service fall squarely within FERC's "transportation" jurisdiction under the NGA, they also fall squarely within FERC's "transmission" jurisdiction under the Federal Power Act. Moreover, as with natural gas curtailments, allowing the states to regulate curtailments of electric energy transmissions over the national electric grid will inevitably lead states to pass laws preferring their own customers over out-of-state consumers, thereby subjecting multi-state utilities to conflicting curtailment priorities.

Finally, even if FERC did not, or could not, directly regulate transmissions embedded in bundled retail sales, KRS 278.214's discriminatory curtailment policy interferes with FERC's ability to regulate wholesale transmissions and rates. A state law requiring that retail transmissions be the first through the wires in the event of a transmission capacity shortfall will inevitably affect the wholesale power market by making transmission of wholesale power less reliable. As one commentator explained, allocation of transmission capacity during an emergency is a "zero sum game," such that a preference for retail transmissions inevitably undermines FERC's attempts to ensure the reliability of wholesale transmissions:

> Inasmuch as both wholesale and retail power flow through common transmission lines as indistinguishable, commingled electrons, allocation of constrained transmission capacity is a zero sum game. After redispatch has occurred to the maximum extent feasible, allocation of transmission capacity to one set of transactions (e.g., electricity sold at wholesale) necessarily affects transmission capacity available for other sales (e.g., retail sales) and vice versa. **The FERC could not effectively regulate either the terms of wholesale service or interstate transmission of power if . . . states are free to command that electricity sold by the transmitting utility in retail transactions be first through the wires in the event of capacity constraints.**

Penniman & Turner, *supra*, 20 ENERGY L.J. at 224 (emphasis added).

Thus, MISO'a argument that KRS 278.214 has no "direct effect on transmissions in interstate commerce" ignores both the plain language and the practical effect of the statute. [MISO Mem., p. 32.] KRS 278.214 directly regulates what steps a transmission system owner may take to redress an emergency on its "transmission facilities" that "necessitates a curtailment or interruption in service." It therefore constrains a system owner's options in responding to a transmission system emergency, and affects the priority in which transmissions necessary to support various types of service are curtailed. The reliability of interstate wholesale transmission service is inevitably affected insofar as KRS 278.214 requires that such wholesale service be subject to interruption when necessary to preserve in-state retail service. This clearly affects transmissions in interstate commerce, and therefore intrudes in an area of exclusive federal jurisdiction. Accordingly, KRS 278.214 is preempted.

**B.      KRS 278.214 is preempted because it directly conflicts with FERC Order 888 and the MISO OATT.**

Even if Congress had not expressly preempted all state regulation affecting interstate transmissions, or otherwise occupied the field, KRS 278.214 is preempted because it **directly conflicts** with the non-discriminatory curtailment requirements contained in FERC Order 888 and MISO's federal tariff. The PSC, apparently conceding there is a direct conflict between Order 888 and KRS 278.214, has attempted to collaterally attack FERC's jurisdiction to regulate curtailment of transmissions to retail customers. Conversely, MISO acknowledges FERC's authority to regulate in this area, but denies there is any conflict between state and federal law. Both arguments fail as a matter of law.

**1.      *Northern States Power* does not immunize KRS 278.214 from preemption.**

The PSC's continued reliance on the Eighth Circuit's decision in *Northern States Power* for the proposition that FERC lacks jurisdiction over retail service curtailments is misplaced.

*Northern States Power* relies on the false premise that FERC cannot regulate transmissions underlying retail sales – a premise that has since been expressly rejected by the Supreme Court in *New York v. FERC, supra.* Regardless, under the filed rate doctrine and the judicial review provisions of the Federal Power Act, the PSC may not use this proceeding to collaterally attack FERC's authority to issue the curtailment regulations contained in Order 888, or FERC's authority to approve the corresponding provisions of the MISO OATT. As this Court has recently observed, "this Court does not have jurisdiction to determine the legitimacy of Order No. 888 . . . ." [*See* 8/5/04 Order, p. 4.] Thus, the PSC cannot challenge FERC's authority to issue Order 888 or approve the relevant provisions of the MISO tariff as a defense to preemption.

Initially, as explained above, FERC's jurisdiction over interstate transmissions encompasses all transmissions, whether connected to a wholesale or a retail sale. *See* Part II.A., *supra.* Any doubt on this point was dispelled by the Supreme Court's decision in *New York v. FERC*, which clarified that "the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer." 535 U.S. at 20. This result is consistent with long-standing Supreme Court precedent holding that FERC's "transportation" jurisdiction under the NGA encompasses regulation of curtailments of service to both wholesale and retail customers, even though its rate-setting jurisdiction is limited to wholesale sales. *See Louisiana Power & Light Co.*, 406 U.S. 621.

After *New York v. FERC*, it is clear that *Northern States Power* is simply not good law for the proposition that the states have exclusive jurisdiction over all transmissions connected to a retail sale, or that FERC cannot regulate in any manner that indirectly impacts bundled retail

service.[9]  FERC has the authority to order non-discriminatory curtailment of bundled retail transmissions and has done so in Order No. 888.  Accordingly, KRS 278.214 is preempted.[10]

Moreover, even if *Northern States* remains good law, both the filed rate doctrine and the exclusive judicial review provisions of the Federal Power Act prevent the PSC from collaterally attacking FERC's authority to enact the curtailment regulations at issue here.  FERC approved the filing of the MISO tariff containing the non-discriminatory curtailment provision after full-blown administrative proceedings in which the PSC participated.  Once filed, that tariff became binding law. *See In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp.2d 1072, 1077 (S.D. Cal. 2003); *Pac. Gas & Elec. Co. v. Lynch*, 216 F. Supp.2d 1016, 1034 (N.D. Cal. 2002); *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951).

Similarly, the Federal Power Act bars a collateral attack on Order No. 888 and the MISO tariff.  As this Court has previously acknowledged, "the Federal Power Act, 16 U.S.C. § 824, *et seq.*, includes an explicit judicial review provision that grants exclusive jurisdiction to review FERC orders to the United States Court of Appeals."  [8/5/04 Order, pp. 4-5.]  Section 825l(b) requires that any challenge to a FERC order be raised in proceedings before the Commission, and provides for exclusive jurisdiction to review FERC proceedings in the Court of Appeals. In essence, the statute requires a party objecting to a FERC order to exhaust its administrative

---

[9]  Although the majority opinion did not directly address *Northern States*, the concurring/dissenting opinion flatly rejected the Eighth Circuit's conclusions with respect to the scope of FERC's jurisdiction. *Id.* at 39 n. 10.

[10]  The presumption against preemption trumpeted by the PSC is of no relevance to the preemption question raised in this case.  That presumption is operative only when "a controversy concerned not the scope of the Federal Government's authority to displace state action, but rather whether a given state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority." *New York v. FERC*, 535 U.S. at 18.  Here, there is no dispute with the PSC as to whether the federal and state mandates actually conflict, only whether FERC exceeded its authority.

remedies, and precludes subsequent litigation of issues "that might have been, but were not, raised in a petition from a Commission order." *Kentucky Util. Co. v. FERC*, 789 F.2d 1210, 1215 (6th Cir. 1986).

Because 16 U.S.C. 825l(b) provides the exclusive avenue for challenging the validity of a FERC order, FERC's authority to issue Order No. 888 and approve MISO tariff cannot be collaterally attacked in this Court. *See United States v. Southern Cal. Edison Co.*, 300 F. Supp. 2d 964, 982 (E.D. Cal. 2004); *Rivers Elec. Co. v. 4.6 Acres of Land*, 731 F. Supp. 83, 86-87 (N.D.N.Y. 1990); *Mega Renewables v. County of Shasta*, 644 F. Supp. 491, 499 (E.D. Cal. 1986).

The *Mega Renewables* case is squarely on point. 644 F. Supp. 491. In that case, a power company filed a declaratory judgment action seeking to invalidate a county ordinance requiring a permit for construction of a hydro-power plant on the grounds that the permit requirement was preempted by the Federal Power Act. *Id.* at 498. The county counterclaimed that the company's FERC-issued construction license was invalid because FERC lacked jurisdiction over the project. *Id.* The court held that under 16 U.S.C. 825l(b), the county's challenge to FERC's jurisdiction "should have been litigated before FERC and, if necessary, appealed directly to the Ninth Circuit. Whether the county challenges FERC's jurisdiction in this instance or the propriety of FERC issuing plaintiffs a license based on other procedural grounds, . . . the county's **only remedy** is to seek judicial review in the appropriate court." *Id.* (emphasis added). Because the issue of FERC's jurisdiction could not be raised by way of collateral attack, the court found "the county's opposition brief is not responsive to the preemption question" and, accordingly, granted the company's motion for summary judgment on its preemption claim. *Id.*

In this case, the PSC actively participated in FERC proceedings regarding approval of the MISO tariff, and expressly objected that approval of the tariff would "cede state jurisdiction over

bundled retail load to FERC."[11] Under Section 825l, the PSC's avenue for judicial review of its objections to FERC's jurisdiction was to appeal these orders to the Court of Appeals. Thus, the provision forecloses the PSC from using this action as a vehicle to litigate issues "that might have been, but were not, raised in a petition from a Commission order." *Kentucky Util. Co.*, 789 F.2d at 1215.

The PSC denies that it is barred from collaterally attacking Order 888, because *Northern States Power* was decided adverse to FERC. [PSC Mem., p. 22.] This argument misses the point entirely. *Northern States Power* was a direct appeal to the Court of Appeals of a FERC proceeding concerning a utility's proposal to adopt an amended curtailment procedure in its tariff that differed from the Order 888 Pro Forma Tariff. *Northern States Power*, 176 F.3d at 1092. The *Northern States Power* decision – which is precedent only in the Eighth Circuit – did not result in an injunction prohibiting FERC from enforcing Order No. 888 against other jurisdictional utilities. Rather, the Court simply remanded for further proceedings before FERC to determine the appropriate terms to include in the utility's tariff.

On remand, moreover, FERC did not construe the Eighth Circuit's decision to preclude any regulation of bundled retail transmissions curtailments. Instead, FERC interpreted the court's holding to apply only to "a narrowly circumscribed factual circumstances – the implementation of curtailment over a transmission constraint after NSP has exhausted all of its network/native load generation redispatch options, but the firm point-to-point transmission customer still has options with which to avoid having to shed load." *Northern States Power Co.*, 89 F.E.R.C. ¶61, 178 (Nov. 15, 1999). Accordingly, FERC announced that it would accept a

---

[11] Notice of Intervention and Protest of the Public Service Commission of Kentucky, Docket No. ER98-1438-000, 3/16/98, at p. 2 (attached to Pls. Mem. in Supp. of Partial Summary Judgment at Appendix 3).

tariff that permitted a preference for native load in this narrow circumstance, provided that NSP "revise its rates for firm point-to-point service . . . to recognize the inferior quality of that service compared to the service provided by NSP to its native load . . . customers." *Id.* Following this order, the utility withdrew its request to adopt an amended curtailment procedure without comment. *Northern States Power*, 89 F.E.R.C. ¶61,299 (Dec. 20, 1999).

If anything, the *Northern States Power* case demonstrates the wisdom of the exclusive judicial review scheme established by the Federal Power Act. Because the utility's challenge to FERC's curtailment orders in *Northern States* was raised in the context of ongoing FERC proceedings, the issue could be remanded to FERC to devise a compromise solution that balanced competing state and federal interests. On remand, FERC can also take into account how changes in one part of a tariff – like curtailment priority – may affect other aspects of the utility's tariff – such as the approved rate for point-to-point service. These are matters best decided before FERC; they cannot be adequately resolved in collateral litigation in federal district courts, as the PSC invites this Court to do.

The PSC's claim that it is not collaterally attacking Order 888 or the MISO OATT because "there is actually nothing in KRS 278.214 that is new" is similarly unavailing. [PSC Mem., p. 23] Apparently, the PSC's position is that since Kentucky always had the authority to enact KRS 278.214, its enactment after the approval of the MISO tariff is not a collateral attack on the federal tariff. However, Kentucky's purported authority to enact KRS 278.214 in the face of a conflicting federal mandate is irrelevant. The issue is whether the PSC can order compliance with a state law that directly conflicts with a provision in a filed federal tariff that has not been challenged by the PSC, or any other party, in a FERC proceeding. Under the filed rate doctrine and the exclusive review provisions of the Federal Power Act, such subterfuge is not allowed.

2.    **KRS 278.214's requirement that Kentucky retail customers be the last to be curtailed is in conflict with the non-discriminatory curtailment requirement of the Order 888 Pro Forma Tariff and the MISO OATT.**

In contrast to the PSC, MISO apparently concedes FERC's authority to regulate curtailments of both wholesale and retail transmissions, but denies that either FERC Order 888 or the MISO OATT are in conflict with the discriminatory curtailment requirements of KRS 278.214. But MISO's suggestion that there is no actual conflict between the state and federal mandates ignores the fact that LG&E and KU are currently parties to PSC enforcement proceedings, in which a conflict has been found to exist. Moreover, MISO's attempt to harmonize the state and federal requirements does not avoid the conflict between them, nor does it reflect a reasonable construction of the relevant state and federal provisions.

The controversy underlying this case emerged from PSC proceedings to enforce KRS 278.214, in which the PSC ordered all regulated utilities to file tariffs complying with the Kentucky statute. [PSC Order, at 2, **Exhibit 4** to Pl. Mem.] During those proceedings, LG&E, KU and AEP proposed to clarify in their tariffs that they would comply with KRS 278.214, as long as they were not required to contravene any contrary federal regulations, such as the nondiscriminatory curtailment provisions of Order 888. The PSC expressly found that the proposed tariffs were "not in compliance with KRS 278.214," and ordered the utilities to file tariffs that adopted KRS 278.214's curtailment preference without qualification. [*Id.* at 3.]

In reaching this conclusion, the PSC declined Kentucky Power's suggestion that the PSC "interpret KRS 278.214 to permit utilities to defer to federal jurisdiction if federal requirements differ from those of the statute" – *i.e.*, to the extent that federal law prohibits "discriminate[ion] in favor of Kentucky residents." [*Id.* at 4.] The PSC responded that "we are not free to 'interpret' a statute so as to read it out of existence. The state is clear on its face and provides no exceptions to the protections to be provided to Kentucky customers." [*Id.*]

The PSC took the same position during proceedings involving AEP's membership in the PJM, which is a regional transmission organization like MISO. [7/17/2003 PSC Order, Case No. 2002-00475, attached as **Exhibit B.**] In initially denying AEP's bid to join PJM, the PSC concluded that "approval of the proposed transfer would be tantamount to acquiescence in violation of [KRS 278.214]." The PSC based this conclusion on the fact that the PJM tariff "requires pro rata interruption or curtailment of both native load customers and wholesale customers, both in-state and out-of-state, purchasing firm transmission service." [*Id.* at 10.] The PSC clearly determined that this non-discriminatory curtailment requirement was inconsistent with KRS 278.214's requirement "that jurisdictional utilities must give native load customers the highest priority in the event of a transmission emergency." [*Id.*]

While MISO points to the subsequent settlement in the PJM proceedings as evidence that there is no real conflict between KRS 278.214 and federal law [MISO Mem., p. 36.], the PJM settlement actually proves the existence of a conflict here. The PSC's approval of the settlement was conditioned on PJM's commitment that it "will direct AEP to curtail retail load **only after** PJM has **exercised all other available opportunities** to remedy an emergency to remedy an emergency without curtailing retail load." [7/19/2004 PSC Order, Case No. 2002-0875, at 8, attached as **Exhibit C** (emphasis added). *See also id.* at Appx. A, ¶ 3b.] PJM further committed that it "will not direct AEP or Kentucky Power to interrupt retail customers as a result of capacity deficiencies elsewhere in the PJM system so long as AEP has maintained adequate capacity in accordance with PJM's reserve methodology." [*Id.* at 7-8. *See also id.* at Appx. A, ¶ 3a.]

The PJM settlement provides no support for MISO's argument that there is no conflict between the federal and state mandates here. First, MISO has not made commitments to LG&E and KU similar to those made by PJM as part of the settlement, nor does it indicate any willing-

ness to do so in its briefs. Presumably, if MISO were willing to abide to the conditions accepted by PJM, it would have indicated as such in this case. Second, the PJM settlement was considered and approved by FERC, effectively "blessing" any departure from these parties' federal tariffs. LG&E/KU do not have the benefit of any similar FERC order that might ameliorate the conflict between KRS 278.214 and the applicable federal tariffs. Finally, there is serious reason to question whether the PJM settlement even resolved the conflict between KRS 278.214 and the PJM tariff, given that AEP – a party to the PJM settlement – is a party to this litigation and has joined in LG&E/KU's claim that KRS 278.214 is preempted. [AEP Mem., p. 15.]

In light of the PSC's orders, MISO cannot credibly suggest that there is no actual conflict between KRS 278.214 and federal regulations. Plaintiffs have attempted to comply with both provisions, but the PSC has determined that that is impossible.

As a practical matter, it is difficult to disagree with the PSC's conclusion. KRS 278.214, in unambiguous terms, demands that in the event of a transmission system emergency, service to Kentucky retail customers cannot be curtailed or interrupted at all unless the system owner has already made every effort to relieve the constraint by curtailing service to all other customers. FERC Order 888 and the MISO OATT, in contrast, direct that all curtailments must be conducted in a non-discriminatory, *pro rata* basis to the transactions that relieve a constraint on the transmission system, without distinguishing between wholesale and retail, or in-state and out-of-state customers. Indeed, the federal mandates expressly require that curtailments to third-party wholesale customers must be performed on a comparable basis to any curtailment of a utility's native load customers. [Order 888 Pro Forma Tariff, §13.6; MISO OATT, §13.6.] MISO does not explain how it is possible to curtail service to Kentucky retail customers last after all other customers have been curtailed, and also curtail service to Kentucky retail customers on a comparable basis to other customers.

- 24 -

MISO's creative interpretive effort to harmonize the competing state and federal mandates does nothing to ameliorate this conflict. MISO's argument appears to be that the MISO OATT merely regulates how MISO allocates curtailments of transmission service among its Transmission Customers, a category that includes transmission system owning utilities like LG&E and KU. MISO then claims that "nothing in [the MISO OATT] directs how a transmission customer must allocate a reduction of its transmission service among the retail customers it serves through its distribution facilities." [MISO Mem., p. 36.] MISO appears to be saying that the Plaintiffs can avoid liability under KRS 278.214, as long as they preference their Kentucky retail customers in their use of the transmission service that MISO allocates to them, even though MISO will curtail Plaintiffs' use of their own transmission system on a *pro rata* basis with other users of the system.

This convoluted interpretation does not square with the plain language of KRS 278.214. The Kentucky statute does not speak to how members of a regional transmission organization allocate curtailments imposed upon them by the system operator. The statute simply mandates an end result – Kentucky customers' service must not be curtailed unless all other customers have first been curtailed. Under MISO's interpretation, in the event of a transmission system emergency, MISO will curtail Plaintiffs' total allocation of transmission service, while allowing third-party transmission customers to continue using a portion of the available transmission service on a *pro rata* basis. Thus, in a case where a substantial curtailment of Plaintiffs' use of the transmission system is ordered, Plaintiffs may have to curtail service to their Kentucky retail customers at a time when third party transmission customers are still being allowed some use of the Plaintiffs' transmission system. This is directly in conflict with the absolute priority KRS 278.214 requires to be given to Kentucky retail customers.

Put another way, the mandate of the statute cannot be avoided simply because an independent system operator is directing how much the Plaintiffs' own use of the system will be curtailed, rather than the Plaintiffs making that decision themselves. Indeed, it is completely contrary to the purpose of the Kentucky statute – which was passed to "protect[] Kentucky ratepayers' interest in transmission facilities which were built to serve their needs and for which they have paid"[12] – to enable a utility to escape its mandates by surrendering control over the curtailment of its own use of the transmission system to an independent entity like MISO.

3.    **KRS 278.214 stands as an obstacle to Congress' policy of creating a competitive national market in power generation.**

Even under MISO's strained interpretation of the MISO OATT and KRS 278.214, the Kentucky statute would still be preempted because it "stands as an obstacle" to the accomplishment of an express federal objective: the creation of a competitive national market in wholesale power generation. *See Schneidwind*, 485 U.S. at 325.

FERC issued Order 888 to facilitate the creation of a "freely traded commodity market in electricity." FERC Order 888A, 62 Fed. Reg. 12,274, 12,275 (March 14, 1997). Order 888 implements Congress' policy promoting the development of a competitive national market in power generation, in which independent power generators compete with vertically integrated utilities to deliver the cheapest energy to purchasers.[13] *See generally New York v. FERC*, 535 U.S. at 8-10; FERC Order 888, 61 Fed. Reg. at 21,546. Creation of a competitive national

---

[12] [PSC Order, at 2, **Exhibit 4** to Pl. Mem.]

[13] In 1977, Congress passed the Public Utility Regulatory Act, which sanctioned the development of alternative generation sources as a means of reducing demand for traditional fossil fuels. 16 U.S.C. § 2601 *et seq*. In 1992, Congress passed the Energy Policy Act ("EPAct"), which also sought to promote competition in the bulk power markets by encouraging new generation entrants and enhancing FERC's authority to order utilities to provide transmission service to independent generators. *See* 16 U.S.C. §§ 824j-824k.

energy market was made possible by technological advances in transmission that have "made it possible for a customer in Vermont [to] purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma." *New York v. FERC*, 535 U.S. at 8 (quotation omitted). *See also* FERC Order 888, 61 Fed. Reg. at 21,545 ("Substantial amounts of energy now move between regions, as well as between utilities in the same region.").

In promulgating Order 888, FERC recognized that the consumer benefits from increased competition among generation sources "could only be realized if more efficient generating plants could obtain access to the regional transmission grids." FERC Order 888, 61 Fed. Reg. at 21,546. Accordingly, FERC ordered regulated utilities to file open access transmission service tariffs with the goal of "ensur[ing] that wholesale purchasers of electric energy can reach alternative power suppliers and vice versa." *Id.* at 21,547.

For independent generators to compete effectively with vertically integrated utilities in the wholesale market, they must be able to provide for reliable transmission of their energy across the transmission systems lying between the generation source and the customer. If states are free to interfere with the reliability of independent producers' wholesale transmissions by affording a curtailment priority to a vertically integrated utility's transmissions underlying its own retail sales, the ability of such independent generators to compete in the national market will be undermined. As explained above, discriminatory state curtailment rules inevitably undermine the reliability and predictability of wholesale transmission service. *See supra*, pp. 15 - 16. "Reliable and competitive wholesale markets cannot be achieved if deliverability of the power – i.e., transmission of purchased power – is subject interference by state oversight of retail sales by individual transmitting utilities." Penniman & Turner, *supra*, 20 ENERGY L.J. at 226.

KRS 278.214, therefore, stands as an obstacle to the creation of the competitive national electricity market envisioned by Congress and FERC. As one pair of commentators summarized:

> [T]he EPAct describes a broad congressional policy in favor of federal regulation of interstate transmission of electricity and congressional encouragement for the FERC to lead the electric industry toward more open and competitive markets. However, the FERC's ability to order wheeling post EPAct (under section 211 of the FPA) or to order interconnections of transmission facilities (under section 210 of the FPA) would be substantially undermined if the utility receiving the order to provide service or an interconnection (or that utility's state regulators) could dictate the applicable degree of transmission firmness and the customer's curtailment ranking. . . . In that context, **each local utility or its state commission would, in effect, be empowered to block or delay transmission deliveries to other states and the wholesale market in order to protect customers in the intrastate market.**

*Id.* (emphasis added).

MISO's contention that KRS 278.214 is "in harmony" with the goal of Order 888 is flatly wrong. [MISO Mem., p. 39.] MISO suggests that because Plaintiffs do not face competition in the Kentucky retail market, a state law giving absolute priority to Plaintiffs' use of the transmission system to serve this market does not implicate the federal interest of promoting competition. [MISO Mem. at 41.] This argument misunderstands the federal policy. As explained above, creation of a competitive national market requires that independent producers be able to reliably transmit their power across multiple utilities and geographic regions. If an environmentally-friendly producer in California wants to sell to a customer in Vermont, for example, it must have reliable transmission service at all points along the way. If that producer faces transmission bottlenecks between California and Vermont because its transmission service is subordinated to retail sales in the intervening states, its ability to compete in the national market is undermined, even though it does not compete for those retail sales. This is exactly the

kind of "patchwork of closed and open jurisdictional transmission systems" that FERC Order 888 was designed to eliminate. FERC Order 888, 61 Fed. Reg. at 21,541.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court enter summary judgment in their favor on their federal preemption and Commerce Clause claims and deny the Defendants' motion for summary judgment.

Respectfully submitted,

_____
Sheryl G. Snyder
David S. Kaplan
Jason P. Renzelmann
FROST BROWN TODD LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202-3363
(502) 589-5400 – phone
(502) 589-1087 – facsimile

**_Attorneys for Plaintiffs, Louisville Gas and Electric and Kentucky Utilities Company_**

OF COUNSEL:
Dorothy E. O'Brien
Deputy General Counsel
LG&E Energy Corp.
220 West Main St., 11th Floor
Louisville, Kentucky 40202
(502) 627-3450

# CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Reply in Support of Motion for Summary Judgment was this 22nd day of October, 2004, served by U.S. Mail, first class mail, postage prepaid, upon:

Dennis G. Howard, II
Elizabeth E. Blackford
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601-8204

Richard G. Raff
Deborah T. Eversole
Kentucky Public Service Commission
211 Sower Boulevard, P.O. Box 615
Frankfort, KY 40602-0615

Andrew Sparks
Assistant United State Attorney
110 W. Vine Street, Suite 400
Lexington, Kentucky 40507-1671

Mark R. Overstreet
Stites & Harbison
421 W. Main St.
P.O. Box 634
Frankfort, KY 40602-0634

David F. Boehm
Kurt J. Boehm
Boehm, Kurtz & Lowry
36 E. Seventh St., Suite 2110
Cincinnati, OH 45202

Katherine K. Yunker
Benjamin D. Allen
Yunker & Associates
P.O. Box 21784
Lexington, Kentucky 40522-1784

Dennis Lane, Solicitor
Federal Energy Regulatory Commission
Washington, D.C. 20426

*Counsel for Plaintiffs, Louisville Gas and Electric and Kentucky Utilities Company*